Present:  Hassell, C.J., Lacy, Keenan, Kinser, Lemons, and
Agee, JJ., and Stephenson, S.J.

TIMOTHY GLEN WORKMAN

v.  Record No. 052411       OPINION BY JUSTICE DONALD W. LEMONS
                                        November 3, 2006
COMMONWEALTH OF VIRGINIA

            FROM THE COURT OF APPEALS OF VIRGINIA

     In this appeal, we consider whether evidence discovered
by the defendant after trial and before sentencing was
exculpatory in nature and should have been disclosed to
Timothy Glen Workman ("Workman") by the Commonwealth prior to
trial.

            I.  FACTS AND PROCEEDINGS BELOW

     Workman was an agent for the United States Drug
Enforcement Administration ("DEA") on temporary assignment in
Roanoke, Virginia.  While off-duty, he was involved in an
altercation with Keith E. Bailey ("Bailey") and James A.
Bumbry, II ("Bumbry").  Workman shot and killed Bailey.
Although he claimed that he acted in self-defense, Workman was
charged with first-degree murder and use of a firearm in the
commission of murder.  A jury acquitted him of murder and use
of a firearm in the commission of murder; however, the jury
found Workman guilty of voluntary manslaughter.  The trial
court sentenced Workman to six years and nine months in prison

in accordance with the jury's verdict; however, the trial court suspended one year and nine months of the sentence.

On the evening preceding the early morning shooting, Workman had been drinking alcoholic beverages at the bar of a restaurant. When the restaurant closed in the early morning hours, Workman accompanied a woman he had met at the bar, Melissa Booth ("Booth"), to her car in the parking lot. While they were sitting in Booth's car, another car came beside them facing the same direction. Bailey and Bumbry, who had been in the restaurant that evening, were in the adjacent car. They motioned for Booth to roll down her window. Workman testified that Booth "seemed kind of alarmed or confused, who are these guys, why are they pulling up beside me." Nonetheless, Booth rolled down her window. Bailey and Bumbry questioned why Booth was with Workman. The verbal exchange escalated when Workman "flipped the finger" to Bailey and Bumbry in response to their comments. Both Bailey and Bumbry left their car. Workman testified that he heard Bailey say, "I'll fucking kill you, you bitch." At that time, Workman retrieved a pistol from his ankle holster and put it in his right rear pocket.

Booth saw Workman transfer the gun at which time Workman identified himself to Booth as "a cop." When Workman opened the passenger side door of Booth's car, he saw Bailey "at the end of the trunk coming straight at [him] yelling" that he

2

knew Booth and that Workman did not have "any business in [Booth's] vehicle."

Workman responded by telling Bailey to "get [his] ass back in the car." According to Workman, Bailey was undeterred and grabbed Workman by the throat and pinned him against the open passenger side door. Workman testified that as he was being assaulted by Bailey, he saw Bumbry coming toward the two men from the front of the car. Workman said that Bumbry was "draw[ing] a small frame automatic [weapon] from his pocket" and that the weapon was "coming towards the back of [Workman's] head."

According to Workman, at this point in the struggle, he drew his own weapon and "began to raise it" hoping that Bailey would step back and Workman could confront Bumbry. But Bailey grabbed Workman's gun and the two men struggled for the weapon while falling toward the passenger seat of the car. Workman testified that he told Bailey that he was "a cop" but the struggle for the gun continued. Workman stated that "[w]ith one man coming behind [him] with a gun, at that time [he] figured [he] had nothing else to do. So [he] tried pulling the trigger." The first shot missed Bailey. As they fell into Booth's car, Workman shot two more times because Bailey was "kind of on top of [him]" and "pull[ed] the trigger one more time" as the fight continued. When Bailey finally fell

3

to the pavement, Workman saw Bumbry and Booth drive away in their cars.

Booth testified that she did not know Bailey or Bumbry but had seen them earlier that night in the bar. She stated that she saw Workman with a gun but did not see Bailey with a weapon. Further, she testified that she did not know whether Bumbry had a gun. Two bystanders each testified that they witnessed an argument between Bailey and Workman and that Bailey was choking Workman by his throat. They heard shots and saw both Bumbry and Booth drive away.

Forensic evidence revealed that four shots were fired from Workman's gun with one lodging in the car seat and three others making close-range "contact" wounds to Bailey's body. Bailey's hands tested positive for the presence of gunpowder residue. Furthermore, DNA testing revealed the presence of Workman's flesh under Bailey's fingernails. Blood alcohol analysis revealed that both Workman and Bailey were intoxicated at the time of the altercation.

Workman was indicted for first-degree murder and use of a firearm in the commission of murder. Workman's counsel filed a motion for discovery and inspection and for exculpatory evidence and a motion for a bill of particulars. The trial court entered an order requiring the Commonwealth to provide all information to which the defendant was entitled pursuant

4

to Brady v. Maryland, 373 U.S. 83 (1963).  Following the discovery order and in exchange for the defendant's withdrawing his motion for a bill of particulars, the Commonwealth's Attorney "opened" the entire file to the defendant and his counsel for review.

At trial, the central issue was whether Workman acted in self-defense, which depended in part upon whether Bumbry possessed a weapon as he approached Workman and Bailey. Workman testified that Bumbry was armed; Bumbry testified that he was not.

After the trial but prior to sentencing, Workman learned for the first time of previously undisclosed evidence that he maintains could have been used to impeach the credibility of Bumbry and that supports the contention that Workman acted in self-defense.  The undisclosed evidence was a pre-trial statement made by Jerry Lee Mackey, Jr. ("Mackey") to Detective M. E. Meador ("Meador") of the Roanoke City Police Department and Officer Kenneth Garrett ("Garrett") of the Roanoke City Police Department who was also cross-designated as a DEA agent.  Mackey stated that a man, later identified as George T. Fitzgerald ("Fitzgerald"), told him that Bumbry tried to pass a gun to Bailey during the altercation in the parking lot and that Bumbry "fled the scene with the weapon." After learning of Mackey's pre-trial statement, Workman's

private investigator, Peter W. Sullivan ("Sullivan"), interviewed Mackey and learned of two recent incidents witnessed by Mackey when Bumbry had used a firearm in altercations with others. One incident took place at a nightclub called "Ghost of Hollywood." Mackey reported that he saw Bumbry shooting at people with a .40 caliber Desert Eagle pistol. Mackey personally witnessed another recent shooting incident at "Iris' Barbershop" where Bumbry had "several guns" and was shooting at a man named J. D. Kasey. Additionally, Mackey's statements led to the discovery of a pre-trial statement by Fitzgerald that Bumbry recently fired a gun at Fitzgerald. Workman filed a motion for a new trial based upon the discovery of this undisclosed exculpatory information.

The trial court denied Workman's request for a new trial. The trial court characterized Mackey's first statement as inadmissible hearsay that did not meet the Brady materiality test. Nonetheless, the trial court stated that it was exculpatory evidence that should have been disclosed because it reasonably would have led to Mackey's subsequent statements. However, the trial court held that Mackey's other statements were cumulative evidence that were not material under Brady. Finally, the trial court concluded that Fitzgerald's statement would have resulted in "a separate

trial within a trial" and noted that it was Fitzgerald who was found guilty of maliciously wounding Bumbry. For these reasons, the trial court concluded that Workman's claims did "not rise to a reasonable probability that the result of the proceeding would have been different."

The Court of Appeals of Virginia affirmed Workman's conviction in an unpublished opinion. After a petition for rehearing and petition for rehearing en banc were denied, Workman filed a notice of appeal to this Court. We granted the appeal on the sole issue of whether the Commonwealth's failure to provide Workman with exculpatory evidence about Bumbry deprived Workman of a fair trial under Brady v. Maryland, 373 U.S. 83 (1963) and its progeny so as to require reversal of Workman's conviction.

## II. EXCULPATORY EVIDENCE

Workman alleges that the Commonwealth erroneously denied him the exculpatory evidence we will refer to as "Mackey I" wherein Mackey told Detective Meador and Officer Garrett on February 15, 2002, that Bumbry tried to pass Bailey a gun in the restaurant's parking lot. As Meador and Garrett interviewed Mackey on a homicide unrelated to the Workman case, Mackey said:

> "So uh also on a DEA matter, at the Ole Charley's Restaurant, uh, JAMES, JAMES II BUMBRY, JAMES BUMBRY, II, uh was with KEITH, what's his last

7

name.  He's the one . . . tried to pass KEITH a gun and the officer, DEA had to respond, whatever happened and JAY II, . . . all that JAY II fled the scene with the weapon. . . . I got that information over the phone from several uh people that's been out there in the streets, just calling friends, reliable friends, . . . said."

Meador told the lead investigator on the Workman case, Detective Shawn Lukacs ("Lukacs") of the Roanoke City Police Department, about Mackey's statement.  Meador told Lukacs that Mackey refused to provide the source of the information.  Garrett indicated that the interview was tape-recorded.  Mackey, however, told Workman's private investigator, Sullivan, that he told the police that Fitzgerald was his source.

Lukacs interviewed Mackey in mid-March 2002 on a separate case; however, Mackey did not provide Lukacs with additional information on the Workman case.  Significantly, Lukacs' testimony does not indicate if he asked Mackey questions regarding the Workman case.  In fact, Mackey told Sullivan that no one from the police department or the prosecutor's office followed up with him to learn more information regarding Bailey's shooting.

Lukacs knew the contents of Mackey I, however, it did not become a part of Workman's investigative case folder.  After the defense received the DEA's permission to interview Garrett, Garrett did not disclose Mackey I to the defense.

8

Garrett was only permitted by the DEA to answer questions that were asked in writing.  There is no indication in the transcripts that Garrett was asked any questions about exculpatory evidence.  In fact, the first time Garrett mentioned Mackey I to anyone was when he spoke with Sullivan after Workman's trial.

In summary, the evidence shows that Meador, Lukacs and Garrett all had knowledge of Mackey I, however, it was not disclosed to Workman prior to trial.  Additionally, there is no indication that the prosecutor had actual knowledge of Mackey I.  In fact, the Commonwealth emphasized in its closing argument before the jury that there was "no corroboration for" Workman's claim that Bumbry was coming at him with a gun during the incident.  Workman asserts that if the Commonwealth had properly turned over the exculpatory statement of Mackey I, it would have led to additional exculpatory statements including "Mackey II," "Mackey III," and "Fitzgerald I."

Mackey II includes two statements that Mackey made to Sullivan on November 20, 2002.  First, Mackey stated that Bumbry always carried a gun and that he had access to several guns.  In fact, Mackey saw Bumbry with guns "very often, all the time, in clubs and just on the block hanging."  Second, Mackey personally observed James Bumbry with a gun shooting at individuals on two separate occasions.  Mackey was at the

9

"Ghost of Hollywood" where Bumbry pulled out a .40 caliber firearm and began shooting at Mackey and his friends. Mackey was also at "Iris' Barbershop" when Bumbry and J.D. Kasey began arguing. After leaving Iris', Bumbry returned with several guns and with his friend Timmy Cunningham. Mackey was getting his hair cut at Iris' when Bumbry ran out of Iris' and started shooting at Kasey.

Mackey III includes two additional statements that Mackey made to Sullivan on November 20, 2002. First, Mackey stated that Bumbry shot Fitzgerald. Mackey did not have personal knowledge of this shooting because he was in jail at the time of the incident. According to Mackey, Bumbry and Fitzgerald "had words" and were "supposed to had got in a fist fight," without guns. After picking up Timmy Cunningham and Shawn Hogney and on his way to fight Fitzgerald at Melrose Park, Bumbry stopped at a stoplight. Mackey said that Bumbry "pulled out a gun and somebody out of the car with, umm, [Fitzgerald] started shooting" and Bumbry was shot in the head. Second, Mackey directly identified Fitzgerald as his source of Mackey I. Mackey said that Fitzgerald told him that: Bumbry "pulled out a gun, tried to pass Keith [Bailey] the gun, and the [DEA] agent shot [Bailey], and [Bumbry] sped off and left, left the scene." Mackey also indicated that

Fitzgerald was at the restaurant the night Bailey was killed and thought Bumbry was carrying a gun.

Mackey III led Workman's investigator to interview Fitzgerald. On November 30, 2002, Sullivan visited Fitzgerald in the Roanoke City Jail to verify that Fitzgerald had a conversation with Mackey regarding the Workman case. Fitzgerald refused to identify someone present at the restaurant who could testify that Bumbry had a gun. Then, on April 9, 2003, Sullivan visited Fitzgerald at the Bland Correctional Facility trying to again find out who called Fitzgerald from the restaurant stating that Bumbry had a gun. While Fitzgerald did not disclose his source, Fitzgerald did tell Sullivan that Bumbry had previously threatened and shot at Fitzgerald. Sullivan subsequently learned that Officer J. W. Michael with the Roanoke City Police Department had taken Fitzgerald's written statement ("Fitzgerald I") with respect to the shooting between Fitzgerald and Bumbry.

Fitzgerald stated in Fitzgerald I that on November 9, 2001, Bumbry had an altercation with Fitzgerald's associate at the Z-Mart on Melrose Avenue, in Roanoke. Later that day, Fitzgerald and some friends were in a car stopped at a red light. A vehicle occupied by Bumbry, Tim Cunningham, and others came beside Fitzgerald's vehicle. Fitzgerald saw "Bumbry stick his arm out the window thats when I ducked and I

11

heard some 7 shots." Officer Michael stated Fitzgerald's videotaped statement could not be found, however, a written transcription admitted as Defendant's Exhibit 4 in post-trial motions provides:  "[Bumbry] rolled down the rear window and shot out of that, as well.  Fitzgerald admitted that there were shots fired from his car, but did not know who fired them."  Officer Michael testified that Fitzgerald's videotaped statement and his written statement would have gone to the records division at the police department.  Fitzgerald was later tried and convicted of maliciously wounding Bumbry in Roanoke City Circuit Court.  At Workman's trial, Bumbry testified that he was involved in a shooting incident in which he was shot in the head, however, he did not identify Fitzgerald as the shooter.

### III.  ANALYSIS

Our analysis must begin with consideration of the evidence we have identified herein as "Mackey I."  Workman maintains that the Commonwealth was required under Brady v. Maryland, 373 U.S. 83 (1963) and its progeny to disclose this statement and further that disclosure would have led to the evidence we have identified herein as Mackey II, Mackey III, and Fitzgerald I.

In Strickler v. Greene, 527 U.S. 263, 280-81 (1999), the Supreme Court of the United States stated:

12

In *Brady*, this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*, at 682; see also *Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995). Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." *Id.* at 438. In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles*, 514 U.S. at 437.

There are three components of a violation of the rule of disclosure first enunciated in *Brady*: a) The evidence not disclosed to the accused "must be favorable to the accused, either because it is exculpatory," or because it may be used for impeachment; b) the evidence not disclosed must have been withheld by the Commonwealth either willfully or inadvertently; and c) the accused must have been prejudiced. *Id.* at 281-82. Stated differently, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its

13

absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995). "[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." United States v. Bagley, 473 U.S. 667, 678 (1985).

Clearly, the withheld evidence including that which Workman maintains the Mackey I statement would have led to must be considered to be favorable to him for impeachment of Bumbry and contradiction of one of the Commonwealth's primary themes in the case, namely, that Bumbry was unarmed. Additionally, it is not contested that the evidence was not disclosed to Workman. Therefore, materiality of the evidence in question becomes an issue for consideration.

In Kyles, the Supreme Court of the United States made several holdings concerning the test of materiality. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant.)" Kyles, 514 U.S. at 434. Second, materiality is not a sufficiency of the evidence test. "A defendant need not

14

demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id., at 434-45. Third, a harmless error analysis is unnecessary once materiality has been determined. Id. at 435. Fourth, suppressed evidence must be "considered collectively, not item by item." Id. at 436. Upon consideration of these factors, a reviewing court is charged with the responsibility of determining if the suppression of evidence "undermines confidence in the outcome of the trial." Bagley, 473 U.S. at 678.

The trial court held that Mackey I did not meet the materiality test because it was "mired in hearsay, opinion and conjecture" and inadmissible. The trial court further held that the statement should have been disclosed to Workman and that its disclosure would have led to Mackey's statement about Fitzgerald. However, the trial court held that the Fitzgerald statement "does not rise to a reasonable probability that the result of the proceeding would have been different."

On appeal, the Court of Appeals held that both the Mackey I and the Fitzgerald I statements were inadmissible. Although the Court of Appeals did not mention Mackey II and III, it further held that "[n]o evidence tended to show that the prosecutor or the police had undisclosed information about Bumbry's specific acts of violence and propensity toward

violence."  As a consequence, the Court of Appeals affirmed the conviction stating, "We hold that the record supports the trial judge's finding that the evidence failed to establish materiality in the constitutional sense."

We disagree with the trial court and the Court of Appeals.  First, while Mackey I may not have been admissible for the truth of the matter asserted, it was admissible for a different reason.  See Winston v. Commonwealth, 268 Va. 564, 591, 604 S.E.2d 21, 36 (2004).  In particular, pursuant to Kyles, Mackey I was admissible to discredit the police investigation.

In a criminal case, the prosecutor must " 'make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense.' "  Kyles, 514 U.S. at 437 (1984) (citations omitted).  In fact, "the prosecutor remains responsible for gauging [the] effect [of undisclosed evidence] regardless of any failure by the police to bring favorable evidence to the prosecutor's attention."  Id. at 421.  More specifically, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  Id. at 437.  In this case, the Commonwealth concedes that the investigators' knowledge of Mackey I was chargeable to the

Commonwealth.  Furthermore, the trial court's discovery order plainly mandated disclosure of such information.

In Kyles, the Supreme Court held that evidence concerning the reliability of police investigations may be admissible. Kyles, 514 U.S. at 446.  The Court favorably cited Bowen v. Maynard, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible Brady violation.").  The Court also favorably cited Lindsey v. King, 769 F.2d 1034, 1042 (5th Cir. 1985) (awarding new trial of prisoner convicted in Louisiana state court because withheld Brady evidence "carried within it the potential . . . for the . . . discrediting . . . of the police methods employed in assembling the case.").

Workman could have used Mackey I to discredit the police investigation by attacking the "thoroughness and even the good faith of the investigation" by failing to adequately follow up on Mackey I.  Kyles, 514 U.S. at 445. Detective Meador was interviewing Mackey on an unrelated crime when he learned of Mackey I.  Officer Garrett was present as well.  Meador subsequently shared the contents of Mackey I with Detective Lukacs, the lead investigator on Workman's case.  Neither

17

Lukacs, Meador, nor Garrett further investigated Mackey's statement.

Additionally, the police officers did not inform the prosecutor of Mackey I and the transcript of Mackey I was not in the investigative file on Workman. Had this information been known to Workman, he could "have attacked the reliability of the investigation in failing even to consider" Mackey I's import. Kyles, 514 U.S. at 446. Mackey I would have been a powerful tool for the defense not for its truth but rather to support its contention that police investigation was inadequate because it failed to further investigate conflicting evidence regarding Bumbry's contention that he did not have a gun at the scene of the shooting.

Having determined that Mackey I was admissible and was material in every sense under Brady and its progeny, we must consider what would have reasonably been discovered from proper disclosure. It is quite clear that Workman's investigator, Sullivan, when apprised of Mackey I after jury verdict but before sentencing, interviewed Mackey and discovered Mackey's personal knowledge of two recent "shoot outs" involving Bumbry (Mackey II). Clearly, there was nothing inadmissible about Mackey's firsthand observations of Bumbry discharging firearms in Mackey's presence. Additionally, Sullivan was led to Fitzgerald, who recounted

18

another recent shooting incident, which he personally observed, where Bumbry discharged a firearm.  There was nothing inadmissible about Fitzgerald recounting his personal knowledge of Bumbry's use and discharge of a firearm.

As we have stated, Mackey I was admissible to attack the reliability of the police investigation.  But even if not admissible, admissibility at trial is not the final arbiter of any Brady violation.

> Evidence may be material under Brady even though it is inadmissible.  When assessing the materiality of inadmissible evidence, we apply the general Brady test and "ask only . . . whether the disclosure of the evidence would have created a reasonable probability that the result of the proceeding would have been different." Because of the requirement that the outcome of the proceeding be affected, we often consider whether the suppressed, inadmissible evidence would have led to admissible evidence.

United States v. Sipe, 388 F.3d 471, 485 (5th Cir. 2004) (citing Felder v. Johnson, 180 F.3d 206, 212 (5th Cir. 1999)); see also United States v. Gil, 297 F.3d 93, 104 (2nd Cir. 2002) (" '[I]nadmissible evidence may be material under Brady.' ") (quoting Spence v. Johnson, 80 F.3d 989, 1005 n.14 (5th Cir. 1996); Wright v. Hopper, 169 F.3d 695, 703 (11th Cir. 1999) ("Inadmissible evidence may be material if the evidence would have led to admissible evidence."); Coleman v. Calderon, 150 F.3d 1105, 1116 (9th Cir. 1998) ("To be material, evidence must be admissible or must lead to

19

admissible evidence."); <u>United States v. Phillip</u>, 948 F.2d 241, 249 (6th Cir. 1991) ("Certainly, information withheld by the prosecution is not material unless the information consists of, or would lead directly to, evidence admissible at trial for either substantive or impeachment purposes.").

The reliance of the trial court and the Court of Appeals on <u>Wood v. Bartholomew</u>, 516 U.S. 1 (1995) and <u>Soering v. Deeds</u>, 255 Va. 457, 499 S.E.2d 514 (1998) is misplaced.  In <u>Wood</u>, the habeas corpus petitioner maintained that the prosecution improperly withheld the results of a polygraph exam.  516 U.S. at 2.  The polygraph exam was not admissible under state law.  <u>Id.</u> at 6.  The petitioner could point to no admissible evidence that knowledge of the polygraph testing results would have revealed.  <u>Id.</u> at 6-7.  The Supreme Court labeled as "speculation" that the disclosure of inadmissible evidence would have led to admissible evidence.  Similarly, in <u>Soering</u>, the inadmissible evidence in question raised no more than an abstract, "'mere possibility that an item of undisclosed information might have helped the defense.'"  255 Va. at 465, 499 S.E.2d at 518 (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 109-10 (1976).  Here, by contrast, Workman proffers admissible evidence that would have been discovered if he had known of Mackey I.

20

The Commonwealth maintains that its agents are only required to disclose what they knew at the time and that they did not know of Mackey II and III and Fitzgerald I. The evidence is not contested that Meador, Garrett, and Lukacs knew of Mackey I even if the prosecutor did not. As the previously cited cases demonstrate, it is not necessary that the Commonwealth know what would have been discovered if proper disclosure of Mackey I had been made.

Additionally, the Commonwealth maintains that Workman's Brady claims fail because if Workman had exercised reasonable diligence, Workman could have discovered Mackey I on his own. The Commonwealth notes that Garrett interviewed Mackey, Workman interviewed Garrett and Garrett testified at trial. Based on these factors, the Commonwealth submits that if Workman "exercised reasonable diligence" in interviewing Garrett, Workman "could have located" Mackey I, "notwithstanding the absence of the information in the Commonwealth's file." This argument ignores Workman's reasonable reliance upon the Commonwealth's "open file" response to his discovery motion. In Strickler, the Supreme Court stated that "if a prosecutor asserts that he complies with Brady through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under Brady."

21

527 U.S. at 283.  Consequently, under Strickler, Workman cannot be faulted for relying on the Commonwealth's open file policy and cannot, on these facts, be found to have failed to exercise reasonable diligence.

Workman's claim of self-defense would have been significantly aided by knowledge of Mackey I, II, and III and Fitzgerald I.  We have very recently held:

> In Virginia, the rule in criminal cases is that, when a defendant adduces evidence of self-defense, proof of specific acts is admissible to show the character of the victim for turbulence and violence, even when the defendant is unaware of such character.  Barnes v. Commonwealth, 214 Va. 24, 25-26, 197 S.E.2d 189, 190 (1973); Stover v. Commonwealth, 211 Va. 789, 794, 180 S.E.2d 504, 508 (1971).  When admissible, such evidence bears upon the questions of who was the aggressor or what was the reasonable apprehension of the defendant for his safety.
>
> Upon the question of who was the aggressor, the issue is what the victim probably did, and evidence of recent acts of violence toward third persons ought to be received, if connected in time, place, and circumstance with the crime, as to likely characterize the victim's conduct toward the defendant.  Randolph v. Commonwealth, 190 Va. 256, 265, 56 S.E.2d 226, 230 (1949).  See Burford v. Commonwealth, 179 Va. 752, 766-67, 20 S.E.2d 509, 515 (1942); Rasnake v. Commonwealth, 135 Va. 677, 697-98, 115 S.E. 543, 549-50 (1923).

McMinn v. Rounds, 267 Va. 277, 281, 591 S.E.2d 694, 697 (2004).  Here, Workman was deprived of introducing evidence of three recent incidents involving Bumbry firing weapons at others.  Most certainly, such evidence has the potential to be

22

powerful impeachment of Bumbry's statement at trial that he did not have a gun at the scene and his denial that he "had been involved with a criminal offense involving firearms . . . [or had been] [p]ulling a firearm on somebody?  Pointing a gun at somebody?"  Additionally, it comprised evidence of Workman's reasonable apprehension for his safety and evidence of who was the aggressor in this altercation.

The credibility of Bumbry versus that of Workman was a significant issue at trial.  The prosecution and the Court of Appeals in its opinion place great emphasis upon Bumbry's testimony.  Their emphasis demonstrates how critical impeachment evidence was to Workman's case.

The Commonwealth maintains that there was evidence before the jury that Bumbry had displayed a weapon and even pointed the weapon at a Deputy Sheriff four years before the incident in this case.  The Commonwealth argues that further evidence of Bumbry's possession and use of weapons would have been cumulative.  However, the Commonwealth discounted the incident as isolated and not recent.  The more recent incidents represented by Mackey II and III and Fitzgerald I had the potential to powerfully contradict the Commonwealth's argument to the jury.  We do not consider these incidents to be cumulative in nature.

We hold that the Commonwealth breached its duty under Brady and its progeny to disclose the statement we have identified as Mackey I. Furthermore, it was admissible to attack the reliability of the police investigation especially considering that no further investigation of the statement was made by police. Even if inadmissible, Mackey I would have led to admissible evidence and consequently, was subject to disclosure. The undisclosed evidence and the evidence that would have been discovered before trial were material. The nondisclosure under the circumstances of this case undermines confidence in the outcome of the trial.

IV. CONCLUSION

The trial court and the Court of Appeals erred in denying Workman a new trial because of Brady violations. We will reverse the judgment of the Court of Appeals and reverse Workman's voluntary manslaughter conviction, and remand this case for retrial if the Commonwealth be so advised for an offense no greater than voluntary manslaughter.

In Price v. Georgia, the Supreme Court considered whether the state of Georgia could retry an accused for murder after an earlier guilty verdict on the lesser included offense of voluntary manslaughter had been set aside because of an error at trial. 398 U.S. 323, 324 (1970). The Supreme Court held that jeopardy for an offense does not continue after an

24

acquittal, "whether that acquittal is express or implied by a conviction on a lesser included offense when the jury was given a full opportunity to return a verdict on the greater charge." Id. at 329; see Powell v. Commonwealth, 261 Va. 512, 545-46, 552 S.E.2d 344, 363 (2001). Consequently, having been placed in jeopardy on the charge of murder and acquitted of murder by the jury, Workman may be retried only for an offense not greater than that upon which his conviction was based, namely, voluntary manslaughter.

Accordingly, we will remand the case for a new trial on a charge no greater than voluntary manslaughter for the killing of Keith E. Bailey, if the Commonwealth be so advised.

Reversed and remanded.