PRESENT:  All the Justices

HOWARD Z. GARNETT, JR.

                                              OPINION BY
v. Record No. 070980               JUSTICE G. STEVEN AGEE
                                          February 29, 2008
COMMONWEALTH OF VIRGINIA

             FROM THE COURT OF APPEALS OF VIRGINIA

     A jury in the Circuit Court of Madison County convicted

Howard Z. Garnett, Jr., of four felonies related to the

abduction and rape of Victoria Duff.  On appeal to the Court of

Appeals, Garnett contended the circuit court erred in failing to

set aside the verdict because the Commonwealth withheld

exculpatory evidence.  Garnett also claimed that he was entitled

to a new trial on the basis of newly discovered evidence.  The

Court of Appeals sitting en banc affirmed the judgment of the

circuit court.  For the reasons set forth below, we will affirm

the judgment of the Court of Appeals.

          I.    RELEVANT FACTS AND PROCEEDINGS BELOW

     Victoria Duff met Garnett in 2001 when he sold her a parcel

of land in Madison County adjacent to the farm where he lived

with his mother.  Duff soon began a consensual sexual

relationship with Garnett and lived with the Garnetts in their

farmhouse while Duff built a house on the parcel she had

purchased.  When her house was completed in August 2002, Duff

moved out of the Garnett home.  According to Duff, she ended the

sexual relationship with Garnett around November 2002, but the

two maintained contact because of the proximity of their homes. Duff alleged that Garnett was verbally and physically abusive throughout the relationship.

Duff testified at trial that on July 24, 2003, she drove to the barn on Garnett's farm to retrieve some property she had stored there. As Duff loaded the items into her truck, Garnett approached her and told her not to remove the items. Duff complied and attempted to leave, but Garnett told her that he wanted her to stay and took her truck keys by force, painfully bending her hand back when she attempted to stop him. Garnett then walked to his nearby house and Duff followed asking for her keys. After collecting some items from the kitchen of the house, Garnett returned to the barn with Duff still following and asking for her keys. Duff did not seek any assistance from Garnett's mother, whom she had seen in the kitchen, or a Department of Transportation road crew paving the road a few hundred feet from the barn. At that point, Garnett told Duff "there was something in the barn that was mine that he wanted to give to me, so I followed him into the barn."

Garnett sat in a chair in the barn and pulled Duff onto his lap. Duff said that she repeatedly objected to Garnett's advances and demanded Garnett return her keys. When Duff attempted to leave the barn, Garnett physically blocked her escape. Garnett then pushed Duff to the back of the barn where

he threatened her, swung his fist and a hoe at her, and pulled her hair and ears.  When Duff tried to scream, Garnett held his hand over her face.  Garnett bent Duff over a waist-high wall in the back of the barn, pulled down her shorts, and penetrated her vagina with his fingers and penis.  Garnett then drove Duff in her truck to her house, left the keys, and walked home.  Duff then drove herself to the Madison County Sheriff's Office.

When Duff arrived at the sheriff's office, her clothes were dirty and in disarray.  Her face was red and puffy and she bore scratches and bruises on her body.  She made a short written statement of the foregoing events on a one-page police form.  A deputy drove her to the emergency room at the University of Virginia hospital for a sexual assault examination by a forensic nurse.  During the examination, the forensic nurse detected bruising and abrasions on Duff's hands, legs, buttocks, and face, as well as genital injuries consistent with recent sexual penetration.  However, no trace of ejaculate was detected.  DNA recovered from Duff's ears, cheeks, and neck was subsequently analyzed by the Division of Forensic Science, which determined that it was between 55 trillion to 440 trillion times more likely that the DNA originated from Duff and Garnett than from Duff and any unidentified third person.

Following the forensic examination, Duff returned to the sheriff's office where she was interviewed by Investigator

3

Michael. Duff participated in another interview with Investigator Michael on July 31, 2003. Both of the interviews were audio recorded and subsequently transcribed. In the July 24 interview, Duff indicated that Garnett had raped her on prior occasions. In the July 31 interview, Duff provided additional information alleging Garnett had previously raped her on January 19 and April 29, 2003. Garnett was arrested and later indicted upon charges of felony abduction with intent to defile, felony assault and battery of a former household member, animate object penetration, and three counts of rape.

The controversy in this case centers, in large part, on the verbatim content of the three statements noted above (collectively, the "Duff Statements"). The Duff Statements comprise: (1) the one-page written statement Duff gave at the Madison County Sheriff's Office on July 24, 2003, when she first reported the events of that day to police and consisting of 12 handwritten lines on a police form; (2) the transcript of Duff's July 24, 2003, recorded interview with Investigator Michael, which consists of 12 typewritten pages; (3) the transcript of Duff's July 31, 2003, recorded interview with Investigator Michael, which consists of 5 typewritten pages.

The Commonwealth disclosed to Garnett statements that he made to police, his criminal record, photographs and diagrams relating to the July 24 incident, as well as Duff's medical

records and certificates of DNA analysis.  The Commonwealth also provided to Garnett two, four-page documents summarizing the Duff Statements (the "Commonwealth's Summary"), describing certain inconsistencies within those statements and between the statements and her testimony at a preliminary hearing in the case.  The Commonwealth did not disclose the Duff Statements verbatim--that is, Garnett was not given either the audiotapes or transcripts of the July 24 or July 31 interviews, nor was he given a copy of the July 24th written statement.

Garnett filed a motion for discovery seeking access to the audiotapes of the Duff Statements "on the grounds that their content is potentially exculpatory."  Garnett stated in his motion "these conversations are potentially exculpatory, but cannot be known simply having the Commonwealth identify inconsistencies . . . .  For example, [Duff's] demeanor is potentially exculpatory."

In a hearing on the motion, Garnett argued that

by listening to the tape you can tell that [Duff's] demeanor was calm, that she is not crying, that she is not upset, that those are things that are also potentially exculpatory. . . .  [I]nflections in her voice and things of that sort have value for us in cross-examining her, perhaps. . . .  There are subtleties and the inflection of a voice, the length of time it takes to answer a question, somebody's demeanor, and all of those things that I think are potentially exculpatory.

5

The Commonwealth proffered that it had reviewed the Duff Statements and "turned over to the defense what it finds to be exculpatory as that term has been defined under case law and under the rules of ethics that govern prosecutorial duties."

Ruling from the bench on Garnett's motion, the circuit court stated that it understood Garnett's argument "about things such as whether the alleged victim is crying or whether the alleged victim appears upset or whether voice inflections and hesitation in answering questions are factors that should be taken into account in terms of the demeanor of the person giving the statement. However, absent some authority that defines those matters either to be exculpatory or potentially exculpatory, we would deny the motion to have access to the tapes for that limited purpose." The circuit court then offered to conduct an in camera review of the Duff Statements to determine whether any exculpatory evidence had been withheld, but Garnett accepted the Commonwealth's proffer that disclosure had been made: "if he's representing that to the [c]ourt as an officer of this [c]ourt, I certainly accept that."

Garnett was tried by a jury and convicted of felony abduction with intent to defile, felony assault and battery of a former household member, animate object penetration, and the charge of raping Duff on July 24, 2003. The jury acquitted

6

Garnett of the charges of raping Duff on January 19 and April 29, 2003.

Following his conviction, Garnett filed a motion to set aside the verdict contending that the Commonwealth had violated Garnett's rights under Brady v. Maryland, 373 U.S. 83 (1963), because it had failed to disclose the verbatim content of the Duff Statements.  Garnett pled that "[e]xculpatory evidence revealed for the purposes of impeachment must therefore include the best evidence available for impeachment."  Pointing to the Commonwealth's introduction of a transcript of Garnett's statements, Garnett contended that the exact words of the Duff Statements were necessary in order to impeach Duff's testimony at trial and that he had been prejudiced by the non-disclosure when Duff testified at trial that she could not recall specific statements she had made.

Garnett also filed a motion for a new trial based on an allegation of newly discovered evidence.  After trial, Duff sent Garnett a list of items that she claimed to own but that remained on his farm, and which Duff wanted returned.  To substantiate her claim of ownership, Duff included a number of purchase receipts.  Garnett's motion described the list and collection of receipts as new evidence that so undermined Duff's credibility as would lead a jury to an opposite result had those items been in evidence at trial.

7

At a subsequent hearing on both motions, the circuit court reviewed the Duff Statements in camera and determined that the Commonwealth had disclosed all exculpatory evidence and impeachment material:[1]

> [T]he [c]ourt has compared the disclosures that took place and the statements that were actually provided to the in-camera materials that the Commonwealth has delivered to the [c]ourt, and here, in the [c]ourt's view, all of the exculpatory evidence and the impeachment material was actually provided to the defense.  The Commonwealth points out in one of its disclosures, very clearly, what the inconsistencies actually consist of.  There's something of a road map to impeachment, so, in the [c]ourt's view, the disclosure was sufficient when one compares what was disclosed to the in-camera materials.

The circuit court also held, in the alternative, "that if, in fact, any Brady violation did occur . . . it does not meet the standard that would be required to justify setting aside the verdict and granting a new trial."

The circuit court further held that Duff's list of items and purchase receipts could have been obtained by Garnett had he exercised due diligence.  In addition, the "new" evidence was corroborative or collateral of existing evidence and would not have produced an opposite result if introduced at trial.  Accordingly, the circuit court denied both motions, and sentenced Garnett to an active term of incarceration of 65 years.

_____

[1] The circuit court ordered the Duff Statements admitted

By a per curiam order, the Court of Appeals refused Garnett's appeal as to the issue of the circuit court's denial of his motion for a new trial based on his claim of after-discovered evidence. Garnett v. Commonwealth, Record No. 3027-04-2, slip op. at 5 (Aug. 17, 2005). However, Garnett's petition for appeal was granted as to his Brady claim. Id., slip op. at 1.

A divided three-judge panel of the Court of Appeals reversed the judgment of the circuit court because it determined that Garnett had met his burden to show a reasonable probability of a different outcome had the Duff Statements been disclosed. Garnett v. Commonwealth, Record No. 3027-04-2, slip op. at 5 (Apr. 11, 2006). Thus, the panel determined the Duff Statements were material under Brady and "a finding that the material is, in fact, exculpatory requires the disclosure of the actual evidence to defense counsel. The accused is entitled to have his counsel review and utilize exculpatory material itself." The panel cited no authority for its conclusion. Id., slip op. at 4.

Upon rehearing en banc, the Court of Appeals reviewed the Duff Statements and determined that the Commonwealth had disclosed all exculpatory evidence. The court cited cases from various federal courts of appeal holding that detailed summaries

into the record under seal.

9

satisfy the prosecution's obligation to disclose exculpatory evidence under <u>Brady</u> even where verbatim statements are available. The court also determined that the disclosure in the Commonwealth's Summary of the exculpatory information from the Duff Statements gave Garnett the exculpatory information for impeachment required by <u>Brady</u>. The majority of the Court of Appeals affirmed the judgment of the circuit court. <u>Garnett v. Commonwealth</u>, 49 Va. App. 524, 642 S.E.2d 782 (2007).

Three members of the Court of Appeals dissented, apparently concluding the verbatim Duff statements were material under <u>Brady</u>. In the dissent's view, Duff's cross-examination without the actual transcripts in hand raised "a probability sufficient to undermine confidence in the outcome of the trial." This conclusion was preceded by an extensive discussion of "prejudice" to Garnett caused by the Commonwealth's failure to disclose other interviews with Duff, which the dissent hypothesized to have occurred. <u>Id.</u> at 554, 642 S.E.2d at 797 (Haley, J., dissenting). We awarded Garnett this appeal.

## II. ANALYSIS

Garnett essentially raises two assignments of error to the judgment of the Court of Appeals.[2] First, Garnett argues his rights under <u>Brady</u> were violated because the Commonwealth failed

---

[2] Garnett makes four actual assignments of error, but these can be condensed to the two issues discussed herein.

10

to "fully and fairly reveal the complete exculpatory evidence . . . in the form of the best evidence available for impeachment."[3]  Separately, Garnett assigns error to the denial of his motion for a new trial based on his claim of newly discovered evidence.

## A.  THE BRADY CLAIM

In Brady, the Supreme Court of the United States held that due process requires the prosecution to disclose to the defendant all favorable evidence material to his guilt or punishment.  373 U.S. at 86-87.  We recently discussed the elements of a Brady claim in Workman v. Commonwealth, 272 Va. 633, 636 S.E.2d 368 (2006):

> There are three components of a violation of the rule of disclosure first enunciated in Brady:  a) The evidence not disclosed to the accused must be favorable to the accused, either because it is exculpatory, or because it may be used for impeachment; b) the evidence not disclosed must have been withheld by the Commonwealth either willfully or inadvertently; and c) the accused must have been prejudiced.  Stated differently, the question is not

---

[3] The Commonwealth argues that, in accepting the Commonwealth's proffer of full disclosure and waiving in camera comparison of the summaries to the Duff Statements, Garnett procedurally defaulted his Brady claim under Rule 5:25.  This argument ignores the distinction between a request for in camera review and the Commonwealth's constitutional obligation to disclose exculpatory material.  A request for in camera review and the Brady right to exculpatory evidence are two distinct concepts.  Brady disclosure is mandatory, and the duty to disclose exists whether the defendant requests disclosure or not.  Waiving an in camera comparison of the Commonwealth's Summary to the Duff Statements was not a waiver of Garnett's constitutional right to all exculpatory evidence.

whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.

Id. at 644-45, 636 S.E.2d at 374 (internal quotation marks, alterations, and citations omitted).

Garnett argues that the verbatim Duff Statements, not just the disclosed impeachment information contained within them, is the material evidence required under Brady. Citing to the majority opinion of the Court of Appeals panel decision that any exculpatory material "require[s] the disclosure of the *actual evidence* to defense counsel," Garnett says "[i]t is precisely this rule that Garnett asks this Court to accept . . . ." "Exculpatory evidence revealed for purposes of impeachment must therefore include the best evidence available for impeachment." Thus, Garnett contends, his Brady rights were violated because that particular form of impeachment evidence was not disclosed by the Commonwealth's Summary and, as a consequence, he was prejudiced by an incomplete ability to cross-examine Duff.

The Commonwealth responds that Garnett is mixing diverse claims which are not a constitutional claim under Brady. The Commonwealth posits that Garnett actually makes a discovery claim for a particular form of evidence as opposed to

12

exculpatory information.  That argument should fail, the Commonwealth contends, because Garnett's discovery rights were governed by Rule 3A:11, which prohibits disclosure of "statements made by Commonwealth witnesses" and provides no "best evidence" rule.  In effect, the Commonwealth argues that Garnett did receive disclosure of the exculpatory information about Duff required by Brady, through the Commonwealth's Summary, and is now conflating rights to discovery he does not have under Rule 3A:11 with his preferred method of cross-examination, neither of which make a Brady claim.

We have reviewed the Duff Statements and begin by acknowledging that Garnett is at a disadvantage in presenting his case as he has never seen the Duff Statements.  Had the Commonwealth simply disclosed the Duff Statements in full, it seems likely Garnett's case would have taken a shorter appellate route.  As did the majority of the Court of Appeals sitting en banc, we recognize that, ordinarily, "the more prudent and expeditious route would have been for the government to provide the recordings and transcripts."  49 Va. App. at 532, 642 S.E.2d at 786.  That being said, however, does not add weight to Garnett's claim of a constitutional deficiency under Brady.

Garnett contends Brady requires "the complete exculpatory evidence in the possession of the Commonwealth in the form of the best evidence available for impeachment of the complaining

13

witness."  He argues this rule is necessary because Duff's cross-examination was hindered without the exact language in the Duff Statements to use to impeach Duff with her prior inconsistent statements.  To support this argument, Garnett cites our decision in Keatts v. Shelton, 191 Va. 758, 63 S.E.2d 10 (1951), which sets out the methodology for impeachment of a witness with a prior inconsistent statement.  However, Keatts has nothing to do with a failure to disclose exculpatory evidence.  See, e.g., 191 Va. at 765, 63 S.E.2d at 13. Garnett's argument has more to do with what he perceives, post-trial, as the most efficacious method to have cross-examined Duff than denial of exculpatory evidence under Brady.  Moreover, Garnett could have proceeded on cross-examination of Duff by other means.[4]

---

[4] While Garnett correctly perceives that impeachment of a witness with prior inconsistent statements requires proof that the witness actually made the inconsistent statement, Patterson v. Commonwealth, 222 Va. 612, 616-17, 283 S.E.2d 190, 193 (1981), Garnett ignores the fact that introduction of the Duff Statements was not the only method of proof available.  As we noted in Patterson, when the witness fails to recall at trial having made an inconsistent statement during a preliminary hearing, "the proper procedure . . . is to use another witness" to prove that the inconsistent statement has been made.  Id. at 617, 283 S.E.2d at 193.  In Patterson, the witness was the court reporter who transcribed the preliminary hearing testimony, id. at 615, 283 S.E.2d at 192.  In the case at bar, the witness could have been the investigator who interviewed Duff, who was identified in the Commonwealth's Summary.  The Duff Statements were therefore not the *only* evidence of Duff's prior inconsistencies, and Garnett's reliance on the Keatts

Garnett cites no precedent that embraces his argument of a Brady "best evidence" claim.  The reason is that there is none, as many appellate courts have examined the issue and rejected a similar argument.

In Kyles v. Whitley, 514 U.S. 419 (1995), the Supreme Court confirmed that Brady does not require prosecutors to disclose all evidence to the defendant.  "[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense.  We have never held that the Constitution demands an open file policy (however such a policy might work out in practice) . . . ."  Id. at 436-37 (internal citations omitted).  Numerous federal and state appellate courts have shared that observation and none has embraced a mandatory Brady "best evidence" rule for disclosure of exculpatory evidence.  For example, in United States v. Phillips, 854 F.2d 273 (7th Cir. 1988), the United States Court of Appeals for the Seventh Circuit determined that the form in which Brady material is produced is within the sound discretion of the trial judge and "Brady does not grant criminal defendants unfettered access to government files."  Id. at 277. In Phillips, the United States Attorney provided a summary of an FBI informant's file pursuant to the defendant's Brady request.

impeachment procedure has no nexus to the issue of whether Brady mandates their disclosure as exculpatory evidence.

15

When the defendant objected and demanded the verbatim statements, the trial court conducted an in camera review and determined "that the file contains no Brady material other than that reflected in the summary." Id. at 278.

Upon appeal, the Seventh Circuit rejected the defendant's claim of error for failing to disclose the verbatim statements, noting that "[f]ederal appellate courts have approved the use of complete and accurate summaries of confidential files as an appropriate means of balancing the due process rights of the defendant and the privacy interests of the government and its witnesses." Id. The court concluded by stating that:

> We reiterate that a Brady request does not entitle a criminal defendant to embark upon an unwarranted fishing expedition through government files, nor does it mandate that a trial judge conduct an in camera inspection of the government's files in every case. Such matters are committed to the sound discretion of the trial judge. We will reverse the judge's actions only upon a showing of abuse of discretion.

Id.

In United States v. Grunewald, 987 F.2d 531 (8th Cir. 1993) the United States Court of Appeals for the Eighth Circuit similarly found no violation of Brady when the government produced only summaries of an IRS agent's investigation notes rather than the notes themselves. Id. at 535.

> [E]ven here where the notes may have been available, absent a showing that the typewritten summaries departed in substance from the handwritten notes, or that the government acted in bad faith, the

16

> typewritten equivalent should be sufficient.  We are unable to conclude that Grunewald has been prejudiced by the government's failure to produce the handwritten notes.

Id.; accord United States v. Van Brandy, 726 F.2d 548, 551 (9th Cir. 1984); Banks v. People, 696 P.2d 293, 297-98 (Colo. 1985).

While Brady does not embrace a "best evidence" rule prohibiting the use of summaries, such summaries of exculpatory evidence must be complete and accurate.  Compare United States v. Service Deli, 151 F.3d 938, 942-44 (9th Cir. 1998) (reversing conviction when the prosecution's summary of undisclosed evidence was inaccurate) with Phillips, 854 F.2d at 278 (affirming conviction when appellate court's comparison of summaries to the undisclosed evidence confirmed trial court's assessment that summaries "fairly and accurately reflect[ed] the contents" of the undisclosed evidence).  An incomplete or inaccurate summary could be constitutionally insufficient under Brady when the omissions or inaccuracies resulted in the prejudicial suppression of material evidence favorable to the defendant.  Therefore, we cannot conclude our review without assessing the adequacy of the disclosures in the Commonwealth's Summary.

As we noted earlier, to establish a Brady right to the disclosure of evidence, the defendant must show that the items in question are (1) exculpatory, (2) not disclosed, and (3)

prejudicial as a result of the failure to disclose.  Workman, 272 Va. at 644-45, 636 S.E.2d at 374.  It is not contested that there was exculpatory information in the Duff Statements.  What Garnett places at issue is that the Duff Statements, the verbatim text, is in and of itself exculpatory.  Thus, under Brady, Garnett contends there was a failure to disclose and he was subsequently prejudiced.

Based on our in camera review of the Duff Statements, we agree with the circuit court and the majority of the en banc Court of Appeals that the Commonwealth's Summary was a sufficient disclosure under Brady.  A review of several portions of the sealed Duff Statements are instructive in that regard.  The Commonwealth's Summary stated that the disclosures made to Garnett from the Duff Statements contained information that "is inconsistent with her testimony at the preliminary hearing."  Garnett had and used a transcript of Duff's preliminary hearing testimony to cross-examine Duff.

The following portion of the July 24, 2003, interview appears to contain much of the dialogue relevant to Garnett's nondisclosure argument.

> INVESTIGATOR MICHAEL:  How many times do you think you told him no you didn't want to do that?
> VICTORIA DUFF:  Well I was telling him no when we first went in and he told me I had to sit on his lap.
> INVESTIGATOR MICHAEL:  Right.

18

VICTORIA DUFF:  I was just telling him then, I don't want you to kiss me, I don't want to sit on your lap I don't want this is not a relationship.

INVESTIGATOR MICHAEL:  Right.

VICTORIA DUFF:  I I'm not interested in this from that moment until we left the farm I was telling him to stop doing it because he wouldn't stop he was fondling me he was uhm trying to make me kept on saying hug me hug me hug me, I don't want to hug you.

INVESTIGATOR MICHAEL:  Right.

VICTORIA DUFF:  I don't want to do this.  This is not appropriate.  I I you know I'm just a neighbor.  Just leave me alone.

INVESTIGATOR MICHAEL:  How long had it been since yall had a relationship?

VICTORIA DUFF:  Uhm I think its been about 2 months now.

INVESTIGATOR MICHAEL:  O.k and you haven't seen him [unintelligible]

VICTORIA DUFF:  Well I see him he comes just as a neighbor yeah.  And I been tempted to go over and get my belongings which I've done a couple times there uhm because there a lot my things there.  Building materials and things.

INVESTIGATOR MICHAEL:  Has he ever done this to you before?

VICTORIA DUFF:  Yes.

INVESTIGATOR MICHAEL:  He's raped you before?

VICTORIA DUFF:  Yes.

INVESTIGATOR MICHAEL:  Have you reported it?

VICTORIA DUFF:  No.

INVESTIGATOR MICHAEL:  How many times has he raped you?

VICTORIA DUFF:  Uhm he's probably forced himself on me two or three times now.

INVESTIGATOR MICHAEL:  And do you know when that occurred?

VICTORIA DUFF:  Aah well the last time it happened I think it was in the month of end of May.

INVESTIGATOR MICHAEL:  Of this year?

VICTORIA DUFF:  Yeah.

Specifically, Garnett contends he could not effectively

cross-examine Duff on the meaning of her "relationship"

19

with Garnett when she testified the relationship terminated prior to the July 24, 2003, rape.  Further, he argues a similar limitation in cross-examining Duff on her reference to a May rape, the number of rapes, her failure to mention seeing Garnett's mother on July 24, 2003, the contents of the July 31, 2003, statement, and the duration of the July 24, 2003, abduction.

## 1. "RELATIONSHIP"

The Commonwealth's Summary informed Garnett that Duff told Investigator Michael "that it had been two (2) months since she had a relationship with the defendant."  Garnett contends this was inadequate disclosure under Brady because it is too ambiguous to be meaningful as impeachment:  "it is impossible to determine what type of relationship she is referring to: business, social or sexual?"  Garnett observes that Duff twice denied at trial that she meant a sexual relationship; rather, Duff testified that she meant "that was the last time he did anything, you know, like till the garden or did anything for me at that time."

The Commonwealth's Summary accurately reflected what Duff said, complete with any latent ambiguity it may have contained. Having the verbatim transcript would have been no more an impeachment disclosure than what Garnett received.  Moreover, Garnett could have called Investigator Michael to testify as to

20

his exchange with Duff and establish any prior inconsistent statement by which to further impeach Duff.  Patterson, 222 Va. at 617, 283 S.E.2d at 193.  Garnett chose not to do so and he cannot now try to bootstrap a Brady claim from his failure to pursue his cross-examination options.

### 2.  DURATION OF ABDUCTION

The Commonwealth's Summary reveals Duff "told Investigator Michael that defendant kept her at the barn from approximately 8:45 a.m. to approximately 1:00 p.m."  This disclosure is substantially correct as the written statement Duff gave on July 24, 2003, included the statement, "[Garnett] let me go at about 1:30 p.m."  In all other respects, the Duff Statements say nothing different from the Commonwealth's Summary.

Garnett argues "[t]his disclosed time period does not match the time period given at the preliminary hearing (which was transcribed and available for use at trial), nor does it match the extended time period that she apparently stated for the very first time at trial (until 2:00 p.m.)."  While that is true, it has nothing to do with any failure to disclose, as the Commonwealth's Summary alerted Garnett to the timeframe.  Having the verbatim Duff Statements would have made no difference in Garnett's intensive cross-examination of Duff on this point as he knew from the Commonwealth's Summary all of the exculpatory information for impeachment.

21

Q: Now, you testified or told Donnie Michael, I believe, that you were held hostage in the barn for five hours.
A: That's corr-
Q: Do you remember telling that?
A: Yes.
Q: And your testimony today is that you got there around 8:30 and what time do you claim this rape occurred?
A: I would guess around noon.

* * * *

Q: Then how come you didn't get to the police department until 2:45?
A: I believe I got there before 2:45.
Q: Okay.
A: And I also believe that Mr. Garnett held me until two o'clock in the afternoon.
Q: He held you until two o'clock in the afternoon?
A: Yes.
Q: Wow. Ms. Duff, you have never said that before today, isn't that true?

* * * *

Q: Ma'am you've never said that before today, isn't that true?
A: You mean to you I've never said that?
THE COURT: To anyone.
Q: To anyone.
A: I believe that I discussed it with Mr. Webb and-
Q: When you testified in court under oath back in October-
A: Uh-huh.
Q: What time did you say all of this had ended?
A: I don't know what time I said it had ended. You can read that back to me and I'll know.

* * * *

Q: Could you turn to page 19 of your testimony, please-
A: Uh-huh.
Q: -and then do you see when I asked you, what time of the day or night was it when you allege that this thing happened at the barn? What's your answer?
A: What line are you looking at?
Q: I'm looking at line five through eight.
A: Okay.

22

Q: See where I say, what time of day or night was it
   when you allege this thing happened at the barn?
   What do you say?
A: Between 8:30 in the morning until about one
   o'clock in the afternoon.
Q: And you testified before that you thought you were
   raped at about 12:30-about 12:30, correct?
A: About Noon-ish, I guess, yes.
Q: About Noon-ish?
A: Uh-huh.  I really didn't have a clock, you know, a
   watch.  I wasn't watching my watch the whole time
   this was going on.


### 3.  PRIOR RAPES

The Commonwealth's Summary disclosed to Garnett that Duff

told Investigator Michael "that she had been raped by the

defendant around the end of May; that the defendant had forced

himself on her probably two or three times now."  Garnett

contends the foregoing disclosure was defective under <u>Brady</u>

because he needed the verbatim Duff Statements to make a proper

impeachment of Duff when the following exchange occurred at

trial:

Q: But when you first talked to Donnie Michael, you
   said that you had been raped at the end of May.
   Do you remember telling him that?
A: No, I don't remember.
Q: Do you deny telling him that?
A: No, I said I don't remember.
Q: And today you're telling us that you were raped in
   January and raped in April.  When you talked to
   Donnie Michael, you told him that it had been
   probably two or three times, correct?
A: Right.  It was three times altogether that I
   recall.
Q: So just let me make clear, how many times today
   are you saying that Mr. Garnett raped you?
A: Three times.

23

The Commonwealth's Summary was accurate and complete on this point as the total verbatim exchange from the Duff Statements confirms:

> INVESTIGATOR MICHAEL:  He's raped you before?
> VICTORIA DUFF:  Yes.
> INVESTIGATOR MICHAEL:  Have you reported it?
> VICTORIA DUFF:  No.
> INVESTIGATOR MICHAEL:  How many times has he raped you?
> VICTORIA DUFF:  Uhm he's probably forced himself on me two or three times now.
> INVESTIGATOR MICHAEL:  And do you know when that occurred?
> VICTORIA DUFF:  Aah well the last time it happened I think it was in the month of end of May.
> INVESTIGATOR MICHAEL:  Of this year?
> VICTORIA DUFF:  Yeah.

The Commonwealth's Summary disclosed all the exculpatory information that was relevant to Garnett's cross-examination of Duff on this point.

### 4.  INTERVIEW OF JULY 31, 2003

The Commonwealth's Summary disclosed to Garnett that in Duff's July 31, 2003, interview with Investigator Michael, "the victim was only asked about the alleged rape of January 19, 2003, and of April 29, 2003."  Garnett contends "[t]his disclosure leaves open too many questions when those dates were first reported and to whom."  However, the remainder of the Commonwealth's Summary specifically describes the remaining information in the July 31st interview.  Our in camera review confirms there is nothing exculpatory for impeachment purposes

24

on this topic contained in the Duff Statements that was not fully disclosed by the Commonwealth's Summary.[5]

### 5. STATEMENTS TO THE COMMONWEALTH'S ATTORNEY

The Commonwealth's Summary informed Garnett that:

> [Duff] told the [C]ommonwealth['s ] [A]ttorney when preparing for trial that she remembered following the defendant to his mother's (Hilda Garnett's) home during the beginning sequence of the events that took place on July 24, 2003 and that she had seen his mother at the sink. She stated that she followed him into the house because he had her car keys and wouldn't give them back. This is inconsistent with her testimony at the preliminary hearing on October 10, 2003 and with what she had previously told Investigator Michael.

There is nothing in the Duff Statements on this matter. Garnett was aware of Duff's failure to include the walk to Garnett's house before the events in the barn occurred in some of her early statements and he cross-examined her on that point. There was simply no other disclosure to be made other than those in the Commonwealth's Summary.

In sum, there is no precedent to support Garnett's claim that <u>Brady</u> encompasses a "best evidence" rule for impeachment material that required the disclosure of the Duff Statements verbatim. The Commonwealth's Summary is an accurate summary of

---

[5] The en banc Court of Appeals dissent took a much different approach than the panel majority. The dissent seemed to premise its holding of prejudice and non-disclosure on its conclusion there were other interviews of Duff that the Commonwealth failed to disclose. <u>Garnett</u>, 49 Va. App. at 545, 642 S.E.2d at 792-93

the exculpatory information contained in the Duff Statements. There was not a failure to disclose on the part of the Commonwealth and thus Garnett fails to show a necessary element of a Brady claim. *A fortiori*, there was no prejudice to Garnett.[6] That is to say, the verbatim Duff Statements were not material in a Brady sense because there is not a reasonable probability that the trial would have resulted in a different outcome had Garnett had the verbatim statements. Lovitt v. Warden, 266 Va. 216, 244, 585 S.E.2d 801, 817 (2003). Accordingly, there is no error in the denial of Garnett's motion to set aside the verdict for a violation of Brady.

### B.   NEWLY DISCOVERED EVIDENCE

> We have repeatedly and consistently stated that motions for new trials based on after-discovered evidence are addressed to the sound discretion of the trial judge, are not looked upon with favor, are considered with special care and caution, and are awarded with great reluctance.  A party who seeks a new trial based upon after-discovered evidence bears the burden to establish that the evidence (1) appears to have been discovered subsequent to the trial; (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant; (3) is not merely cumulative, corroborative or

---

(Haley, J., dissenting).  That conclusion has no basis in the record, including the Duff Statements.

[6] In the circuit court, Garnett specifically asked for the audiotapes of the Duff Statements based on his claim that "demeanor [is] potentially exculpatory."  While we agree with the circuit court's judgment denying the disclosure of the audiotapes because there is no "authority that defines those matters . . . to be exculpatory," we also note that Garnett did not make this argument on brief and it is therefore defaulted under Rule 5:17(c).

collateral; and (4) is material, and such as should produce opposite results on the merits at another trial. The moving party must establish each of these mandatory criteria.

Commonwealth v. Tweed, 264 Va. 524, 528-29, 570 S.E.2d 797, 800 (2002) (internal quotation marks, alterations, and citations omitted).

Even if we assume, as did the circuit court, that Garnett discovered Duff's records after the trial, he has plainly failed to prove any of the remaining criteria required for the grant of a new trial. As the circuit court noted, the records were not created after trial but existed at the time of trial.

> In the [c]ourt's view, a subpoena duces tecum to the victim or to other entities could have produced these records. . . . Had it been issued to her, it could have covered any purchases, transactions, business dealings with the defendant . . . . She never denied that she had these records. . . . [S]uch evidence and any documents that might relate to it would certainly be something that the defense would know about and, if deemed appropriate, would want to explore before trial. In short, in the [c]ourt's view, there was nothing secret about it. These documents do not involve a subject that was what could be called a new development or a surprise of any type that was revealed for the first time on the eve of trial, so the [c]ourt is not persuaded that the due diligence requirement is met here.

We agree with the circuit court's conclusion. The records could have been obtained by Garnett prior to trial by an exercise of due diligence, which he simply failed to perform. The circuit court continued by observing that "[t]here was extensive evidence in cross-examination about" the business

27

relationship between Duff and Garnett and found that the records were merely "corroborative or collateral" to that evidence.  The circuit court concluded by citing our decision in Tweed:

> The standard is not whether there's a reasonable probability of a different result.  That argument was made and rejected by the Tweed [C]ourt; rather, the standard, as set forth by the Tweed [C]ourt, was whether the defense establishes that the evidence was . . . such as should have produced opposite results on the merits at another trial . . . .  Here the [c]ourt is not persuaded that, had these records been available, that under the standard in Tweed, they would have or should have produced an opposite result on the merits of the trial.

We agree with the determination of the circuit court and therefore conclude that the Court of Appeals did not err in holding that the circuit court did not abuse its discretion in denying Garnett's motion to set aside the verdict and for a new trial.

## CONCLUSION

For the foregoing reasons, we will affirm the judgment of the Court of Appeals.

Affirmed.