COURT OF APPEALS OF VIRGINIA

**PUBLISHED**

Present: Judges Humphreys, Beales and AtLee
Argued at Richmond, Virginia


JAMES EDWARD MERCER

OPINION BY
v.     Record No. 1897-14-2     JUDGE ROBERT J. HUMPHREYS
MARCH 22, 2016

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CAROLINE COUNTY
Jonathan C. Thacher, Judge Designate

J. Todd Duval (McDonald, Sutton & Duval, PLC, on brief), for
appellant.

Craig W. Stallard, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


James Edward Mercer ("Mercer") appeals the October 7, 2014 decision of the Circuit

Court of Caroline County (the "circuit court") finding that no Brady violation occurred in his

case and its decision denying Mercer's motion to set aside the verdict and for a new trial.

Mercer's single assignment of error is that the circuit court's ruling constitutes a violation of his

Fourteenth Amendment rights under Brady v. Maryland, 373 U.S. 83 (1963), because of "the

Commonwealth's failure to disclose evidence about the quality and reliability of the work by the

lab technician who performed the certificates of analysis upon which the Commonwealth's case

relied."

I. BACKGROUND

In March 2014, a Caroline County grand jury issued three indictments against Mercer for

distribution of a Schedule I or II drug in violation of Code § 18.2-248. On April 10, 2014,

pursuant to Brady, Mercer filed a motion for disclosure of favorable evidence and statements. At

Mercer's bench trial, on June 18, 2014, he entered a plea of not guilty. Additionally, Mercer answered in the affirmative that it was his intent to be tried without a jury.

At trial, Deputy Justin Cecil ("Deputy Cecil") and Investigator Christopher Wright ("Investigator Wright") of the Caroline County Sheriff's Department ("the Department") testified for the Commonwealth. Deputy Cecil testified that controlled purchases were conducted by the Department on September 27, 2013, October 8, 2013, and October 16, 2013. Investigator Wright testified that Mercer was the target of a controlled purchase operation and that the Department employed Charity O'Connell as its confidential informant ("C.I."). Prior to each controlled purchase, Investigator Wright searched the person of the C.I. and Deputy Cecil searched the C.I.'s vehicle for any contraband. No contraband was ever found in these pre-purchase searches. Also, for each controlled purchase, Investigator Wright equipped the C.I. with an audio wire and gave her $100 in order to purchase narcotics.

The September 27, 2013 and October 16, 2013 controlled purchases were conducted at 23076 Telegraph Road. The October 8, 2013 controlled purchase occurred in a black Ford F-150 at the C.I.'s home. Every controlled purchase was audibly recorded by the Department. For controlled purchases on September 27, 2013 and October 16, 2013, Investigator Wright testified that he was unable to see the actual residence from his surveillance point. He also testified that he could not see who was inside the black Ford F-150 during the second controlled purchase on October 8, 2013. However, he testified that he had become familiar with Mercer's voice from listening to known tapes of Mercer's conversations at the Pamunkey Regional Jail and that he recognized the voice of the person in the black Ford F-150 during the controlled purchase on October 8, 2013 to be Mercer's voice. Additionally, the C.I. testified on behalf of the Commonwealth that on all three occasions she purchased cocaine from Mercer, and, after each

controlled purchase, the C.I. provided Investigator Wright with the purchased narcotics. Mercer elected not to present any evidence during his trial.

Each of the three narcotics purchases was submitted to the Department of Forensic Science ("DFS") for analysis. Nancy M. Peace ("Peace"), a forensic scientist employed by DFS, was the only forensic scientist to sign each certificate of analysis associated with Mercer's case. All three certificates specified that the narcotics recovered in the controlled purchases were cocaine.

On March 24, 2014, prior to trial and in accordance with Code §§ 19.2-187, 19.2-187.1, the Commonwealth provided Mercer with notice that it intended to offer each of the certificates of analysis into evidence. Mercer did not exercise his right to object to the admission of the certificates of analysis pursuant to Code § 19.2-187.1(B) and instead require the presence and testimony of Peace to establish the facts and scientific opinions contained in the certificates. At the bench trial, on June 18, 2014, each certificate was offered and admitted into evidence without objection. At the conclusion of the Commonwealth's evidence, Mercer made a motion to strike the evidence against him. The circuit court overruled Mercer's motion to strike. Mercer renewed his motion to strike the evidence, and the circuit court denied that motion as well. On June 26, 2014, the circuit court found Mercer guilty on three counts of distribution of a Schedule I or II drug, in violation of Code § 18.2-248.

On September 17, 2014, the circuit court sentenced Mercer to five years on each count with three years suspended for each. Thus, he must serve a total of 15 years' incarceration, with nine years suspended. Two days after his sentencing hearing, on September 19, 2014, the King William County Commonwealth's Attorney, Matthew R. Kite, sent a letter notifying Mercer that

Peace had been terminated for cause from DFS. Peace had been terminated by letter on August 11, 2014.[1]

On October 1, 2014, Mercer filed a motion to set aside the verdict and for a new trial arguing that his constitutional rights under Brady were violated because the Commonwealth had not made him aware of Peace's termination for cause from DFS. Thus, Mercer argued, doubt had been cast "upon the credibility of the analyst having signed the certificates of analysis [creating] a material issue, in that the nature and character of the drug being distributed is the *corpus delicti* of the crime." The Commonwealth submitted its response, on October 6, 2014, noting that Mercer's trial occurred nearly two months before it became aware of Peace's termination; therefore, it could not have provided Mercer the information regarding Peace's termination prior to or during trial.

After learning of Peace's termination, the Commonwealth promptly requested that any substances tested by Peace in cases then pending trial be resubmitted for testing by another analyst.[2] Additionally, the Commonwealth reviewed Peace's personnel records and spoke with the supervisor of DFS's controlled substances section. According to the Commonwealth, it determined that 1) DFS utilizes a quality control program which mandates a full technical peer review of the data in every case before a certificate of analysis is released in order to determine whether the original analyst's finding is supported by the data; 2) in May 2014, a technical review of Peace's casework revealed that she had failed to recognize and identify Salvinorin A, a

---

[1] We note that Peace's termination letter was not included in the record. The only reference to it is in the September 19, 2014 letter written by King William County Commonwealth's Attorney Matthew R. Kite to counsel for Mercer in a different case pending in that jurisdiction.

[2] Because Mercer's trial had already taken place, the evidence in this case was not retested.

Schedule I controlled substance—the failure was caught by technical peer review and corrected before a certificate of analysis was released; 3) Peace, on two previous occasions, had also failed to identify the presence of a controlled substance—each of those two failures was also caught by technical peer review and corrected before a certificate of analysis was released; 4) Peace never misidentified anything benign as a controlled substance, rather, her errors were in failing to identify the presence of a controlled substance; 5) due to the peer review system, even when Peace initially failed to identify the presence of a controlled substance, DFS never released a certificate of analysis that was incorrect; and 6) since Peace's termination, thirty-five substances previously tested by Peace were resubmitted for testing by another analyst and in all thirty-five instances the new analyst confirmed Peace's original findings. On October 7, 2014, the circuit court found no Brady violation in this case and denied Mercer's motion to set aside the verdict and for a new trial.[3]

## II. ANALYSIS

### A. Standard of Review

On appeal, this Court "will state the evidence in the light most favorable to the Commonwealth, the prevailing party at trial." Bly v. Commonwealth, 280 Va. 656, 658, 702 S.E.2d 120, 121 (2010). Under Brady, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The Commonwealth's disclosure duty encompasses impeachment evidence as well as exculpatory evidence. See United States v. Bagley, 473 U.S. 667, 676 (1985). It is now a settled principle that there are three components of a true Brady violation: (1) the evidence at issue

---

[3] The record does not contain a transcript from the hearing on the motion to set aside the verdict and for a new trial.

must be favorable to the accused, either because it is exculpatory, or because it impeaches a witness regarding a material fact; (2) that evidence must have been suppressed by the State, either willfully or inadvertently, thereby denying a defendant its use at trial; and (3) prejudice must have ensued. Strickler v. Greene, 527 U.S. 263, 281-82 (1999). "The accused has the burden of establishing each of these three components to prevail on a Brady claim." Commonwealth v. Tuma, 285 Va. 629, 635, 740 S.E.2d 14, 17 (2013).

The first two Brady components require the evidence to be favorable to the defendant and to have been suppressed by the prosecution. The third Brady component is that the defendant must prove prejudice. "Favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Bagley, 473 U.S. at 682 (quoting Strickland v. Washington, 466 U.S. 668, 694 (1984)). Prejudice, like materiality, is "defined as a 'reasonable probability that the outcome would have been different had the evidence been disclosed to the defense.'" Deville v. Commonwealth, 47 Va. App. 754, 756-57, 627 S.E.2d 530, 532 (2006) (quoting Muhammad v. Commonwealth, 269 Va. 451, 510, 611 S.E.2d 537, 571 (2005)). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Kyles v. Whitley, 514 U.S. 419, 433 (1995).

## B. Brady Material

Mercer argues that the circuit court's ruling constitutes a violation of his Fourteenth Amendment rights under Brady v. Maryland because of the Commonwealth's failure to disclose evidence about the quality and reliability of the work by the lab technician who performed the certificates of analysis upon which the Commonwealth's case relied—even though the Commonwealth was not aware of the lab technician's employment status until two months after

the trial, but one month prior to sentencing.  Before continuing with a <u>Brady</u> analysis, we first consider if the evidence in question falls within the ambit of <u>Brady</u>.  It does not for two reasons.

First, the point of the holding in <u>Brady</u> is to require disclosure of favorable evidence for possible use by the defense to avoid "an unfair trial to the accused."  373 U.S. at 87.  In <u>Kyles</u>, the Supreme Court of the United States made it clear that a prosecutor must "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense." 514 U.S. at 437 (citations omitted). Specifically, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." <u>Id.</u>  For the purposes of this analysis, this Court assumes that DFS is included in the category of "acting on the government's behalf" and that the Commonwealth is charged with knowledge of DFS's actions.  However, the earliest date for which the Commonwealth can be attributed the knowledge of Peace's termination for cause was August 11, 2014—the date of her termination letter.  Since this date is two months post trial, the Commonwealth, could not have provided Mercer the information prior to or during trial because such information did not exist at that time.  Simply put, the information was not available to the Commonwealth prior to trial; therefore, the Commonwealth could not make it available to the defendant. [4]

---

[4] Although styled here as a <u>Brady</u> violation, to the extent that evidence of an exculpatory nature is discovered post trial where <u>Brady</u> is inapplicable, appropriate relief to be sought would seem to be a new trial based upon after-discovered evidence.  In such a case and similar to the procedures under <u>Brady</u>, the moving party

> bears the burden to establish that the evidence (1) appears to have
> been discovered subsequent to the trial; (2) could not have been
> secured for use at the trial in the exercise of reasonable diligence
> by the movant; (3) is not merely cumulative, corroborative or
> collateral; and (4) is material, and such as should produce opposite
> results on the merits at another trial.

Second, the prong of <u>Brady</u> that would otherwise be applicable here is the possible impeachment of Peace, the forensic scientist that signed the certificates of analysis in Mercer's case. Mercer argues that had he "been made aware of the performance and reliability issues of Nancy Peace prior to trial, [he] would have objected to the admission of the certificates of analysis performed by her, request that she be made available to introduce the certificates, and asked for a jury trial." However, Mercer fails to satisfy the first prong of <u>Brady</u> because the evidence is neither exculpatory nor would it constitute grounds for impeachment.

Initially, we note that the failure of Peace to identify controlled substances in three other unrelated cases is not exculpatory as to Mercer. Her performance as a scientist or technician in other cases does not establish that Mercer is innocent of these offenses, nor does the nature of it reduce either the offense or the penalty that may be appropriate in this case. Regarding impeachment, Mercer concedes that he would not be able to introduce mistakes by Peace that occurred in unrelated cases. Rather, he simply asserts that his strategy would have been different, in that had he been made aware of Peace's employment status he would have objected to the admission of the certificates of analysis, called Peace to the stand, and asked for a jury trial.[5] In this retrospective assessment, Mercer would attempt to demonstrate that because Peace was terminated for cause, her findings should be considered unreliable by a new fact-finder, a jury. However, while we do not doubt that a different trial strategy may, with hindsight, possibly

<u>Odum v. Commonwealth</u>, 225 Va. 123, 130, 301 S.E.2d 145, 149 (1983). Because Mercer did not raise this issue below or brief and argue it on appeal, we do not consider whether the evidence in this case meets these criteria. <u>See</u> Rule 5A:18.

[5] In such a situation, pursuant to both <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305, 307 (2009), and Code § 19.2-187.1(B), the Commonwealth would be required to call the lab technician who performed the analysis in order to admit the evidence; otherwise, it would violate the defendant's right to confront witnesses against him under the Sixth Amendment.

have been more efficacious, the mere possibility that an alternate trial strategy *might* produce a more beneficial result is not the proper test for a Brady violation.

Were we to adopt Mercer's argument in this case, this Court would have to assume impeachment, if even possible under the rules of evidence regarding the admissibility of relevant evidence, would be under a bias or prejudice theory. This is because Peace would be called as a government witness. This record reflects no bias or prejudice by Peace against Mercer. It goes without saying that we are all fallible and errors or mistakes can occur in any human endeavor but unless it can be shown that an error or mistake is material to a fact at issue in the case at bar, it has no more than speculative relevance.

Nevertheless, in Workman v. Commonwealth, 272 Va. 633, 647, 636 S.E.2d 368, 376 (2006), the Supreme Court of Virginia made clear that "admissibility at trial is not the final arbiter of any Brady violation." Rather,

> [w]hen assessing the materiality of inadmissible evidence, we apply the general Brady test and "ask only . . . whether the disclosure of the evidence would have created a reasonable probability that the result of the proceeding would have been different." Because of the requirement that the outcome of the proceeding be affected, we often consider whether the suppressed, inadmissible evidence would have led to admissible evidence.

Id. at 647-48, 636 S.E.2d at 376 (quoting United States v. Sipe, 388 F.3d 471, 485 (5th Cir. 2004)).

However, the basis for Peace's termination was her failure to identify controlled substances that were present, not falsely identifying controlled substances where none existed. Thus, any bias theory would seem to operate in favor of Mercer rather than against him. The evidence in question here is not favorable to Mercer, and its disclosure would not have created a reasonable probability that the result of the proceeding would have been different. The record does not indicate that Peace ever made a false positive drug analysis. Rather, her termination

- 9 -

from DFS was due to three separate false negative readings.[6]  When a false negative drug screen occurs, a recovered substance that should have tested positive for narcotics is mistakenly read to be negative.  Thus, the recovered substance would not be reported as a Schedule I or II substance and the defendant would likely not be prosecuted for a narcotics related crime.  The opposite occurs with a false positive drug reading.  In a false positive drug reading, the analyst would indicate that a recovered item tested positive as a controlled substance, when, in reality, it was not an illegal substance at all.

The suppression of evidence of an analyst's history that demonstrated previous instances of false positive drug screens might be evidence favorable to the defendant because it would show that the analyst had a history of indicating a recovered item was controlled and illegal when it was not.  The effect of such findings could subject a defendant to conviction of a crime for which the proof may be inaccurate.  However, a history of false negative readings, like Peace's, only indicates that she found recovered substances not to be a controlled substance when, in fact, they were.

Any fault Mercer desires to attribute to Peace's analyses in other cases is not beneficial to him.  Without undisclosed favorable evidence, a Brady violation cannot occur.

### C.  Lack of Prejudice

It is also clear from this record that Mercer failed to meet his burden that the "suppression of evidence 'undermines confidence in the outcome of the trial.'"  Workman, 272 Va. at 645, 636 S.E.2d at 375 (quoting Bagley, 473 U.S. at 678).  Here, the record supports confidence in the outcome of the trial.

---

[6] The record is silent on the length of time between each of Peace's three false negative readings.

First, every drug analysis performed by DFS is required to undergo full technical peer review of the data before a certificate of analysis can be released. The state has implemented this precautionary procedure in order to determine whether the original analyst's finding is supported by the data. It was this quality control procedure that uncovered the deficiencies in other cases and there is no evidence that DFS's mandatory quality control procedure was not followed in this case. Second, no evidence was presented that Peace ever misidentified anything as a controlled substance that was not; rather, the evidence shows that her errors were in failing to identify the presence of a controlled substance. Third, each of the thirty-five substances previously tested by Peace that were resubmitted for testing by another analyst returned the same result as Peace had originally found.

Therefore, we conclude that, in this case, confidence in the verdict remains intact, regardless of Peace's post-trial termination, because no reasonable doubt exists that the three certificates of analysis returned in Mercer's case were accurate in Peace's conclusion that they tested positive for cocaine. Also, there is no indication in the record that the substances submitted to DFS were not recovered by the Department during its controlled purchase operation targeting Mercer. Regardless of the allegations surrounding Peace, the Commonwealth proved that Mercer distributed a Schedule I or II controlled substance on three separate occasions. Thus, Mercer has failed to meet the third prong of the Brady analysis that prejudice resulted from favorable evidence that was suppressed by the government.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court that there was no Brady violation and conclude that Mercer's motion to set aside the verdict and for a new trial was properly denied.

Affirmed.