COURT OF APPEALS OF VIRGINIA

Present: Judges Malveaux, Ortiz and Friedman
Argued at Norfolk, Virginia

ALPHONZO LAMONT SMITH

MEMORANDUM OPINION* BY
v.    Record No. 1912-22-1    JUDGE MARY BENNETT MALVEAUX
OCTOBER 24, 2023

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Jerrauld C. Jones, Judge

Edward A. Fiorella, Jr. (Fraim & Fiorella, P.C., on briefs), for
appellant.

Craig W. Stallard, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Alphonzo Lamont Smith ("appellant") appeals his convictions by a jury of two counts of

first-degree murder, in violation of Code § 18.2-32, two counts of use of a firearm in the

commission of a felony, in violation of Code § 18.2-53.1, and one count of robbery, in violation of

Code § 18.2-58. He argues the trial court erred by denying his motion for a new trial based on

claims of ineffective assistance of counsel and *Brady v. Maryland*, 373 U.S. 83 (1963), violations,

allowing cooperating witnesses' attorneys to assert attorney-client privilege, denying his motion to

strike, and allowing certain uses of a transcript at trial. For the following reasons, we affirm in part,

reverse in part, and remand to the trial court.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

## I. BACKGROUND[1]

"'In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party [below].' Accordingly, we regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence." *Meade v. Commonwealth*, 74 Va. App. 796, 802 (2022) (citation omitted) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)).

On July 25, 2019, Detective Jemal Davis of the Norfolk Police Department learned that two people had been shot in a car at an apartment complex. When Davis arrived at the scene of the shooting, he found a Cadillac with a shattered driver's-side window parked with its engine running. A person in the front passenger seat, Markee Turner, was dead. Turner had been shot twice in the head. Before Detective Davis's arrival, Tamian Davis had been removed from the driver's seat and taken to the hospital, where he was pronounced dead. Tamian Davis had been shot multiple times, including in the chest, neck, and head.

Detective Davis encountered appellant at the scene of the shooting. Davis noted that appellant was "sweating profusely" while no one else Davis saw was sweating in the same manner. Davis also noticed that appellant was wearing an apron, and inquired about it; appellant said he was a barber. Davis asked appellant if he knew someone who drove a gold Cadillac, was familiar with the victims' car, or knew Turner. Appellant answered no to each question. Appellant also denied having heard any gunshots.

### Events at Trial

At trial, Shakinah Dunn testified that at the time of the shooting, she and her boyfriend were staying at the apartment complex. When the Commonwealth's attorney asked Dunn if

---

[1] The Hon. Junius P. Fulton, III briefly participated in this case in the trial court. Subsequently elected to this Court, Judge Fulton took no part in the consideration or resolution of this appeal.

anyone else had been in their apartment that day, she replied that she "d[id]n't remember." Questioned further, Dunn acknowledged she had testified at a November 19, 2019 preliminary hearing, but stated that she could not recall the substance of her testimony. The Commonwealth's attorney then provided Dunn with a copy of the hearing transcript and asked her to review her testimony. Upon reviewing the transcript, Dunn acknowledged that it refreshed her recollection "[a] little bit." But when asked again whether, on the date of the shooting, someone else had come to the apartment, Dunn stated that she could not remember.

The Commonwealth moved the trial court to declare Dunn an unavailable witness, "given that she is now acting as a witness who is forgetting." It further requested that the court permit the Commonwealth to present Dunn's preliminary hearing testimony by having it read to the jury. Appellant's counsel objected and argued that Dunn was not unavailable; rather, she was "present to testify" but "choosing not to testify." Counsel further argued it would be "highly prejudicial" to allow Dunn's preliminary hearing testimony into evidence because counsel would lack the ability to cross-examine Dunn effectively about its contents. The court overruled appellant's objection and permitted use of Dunn's preliminary hearing transcript.

The following day at trial, but outside the presence of the jury, Dunn was questioned again about her recollections. She stated that she did not remember her preliminary hearing testimony and was unsure whether she could recall testifying at the hearing. When questioned further by counsel for appellant, Dunn acknowledged that reading the transcript had caused her to remember things "[a] little bit." When the Commonwealth's attorney then asked Dunn if she was "ready to try" to testify, Dunn responded affirmatively. The court noted Dunn's response before addressing Dunn, stating, "[s]he said she's going to try to testify truthfully. Isn't that what you said, ma'am?" and Dunn responded, "[y]es." After Dunn was given time to review further the preliminary hearing transcript, the jury was recalled and Dunn testified.

Dunn told the jury that on the evening of the shooting, she was with her boyfriend at the apartment complex. She did not hear any gunfire. Upon further questioning by the Commonwealth, Dunn began to respond that she could not remember or recall various details from that night. The Commonwealth then referred Dunn to the transcript of her preliminary hearing testimony. Relying upon the transcript, and without objection, Dunn then acknowledged she had testified that someone else had come to the apartment and that she had given his name in court as Alphonzo or "Zo." She further acknowledged she had identified Alphonzo in court during the preliminary hearing. The Commonwealth then requested, without objection, that Dunn read several lines from the transcript. Dunn complied, stating that, "[i]t says, 'Alphonzo went into the kitchen and he pulled out some money and a watch.'" Again without objection, the Commonwealth asked Dunn to read two additional lines from the transcript, and she complied. One indicated that Dunn had stated at the hearing that the amount of money produced by Alphonzo was "[l]ike a stack"; Dunn explained to the jury that a "stack is . . . a lot of money, a chunk of money." According to Dunn, Alphonzo also stated, "I fucked up." Alphonzo began counting the money and gave some of it to Dunn's boyfriend, before stating, "I just came up. I just hit a lick." Dunn said she had explained at the hearing that "a lick" was a robbery. Reading from the transcript, again without objection, Dunn then said that Alphonzo "took a shower," "put back on the same clothes," and left.

The Commonwealth showed Dunn a photograph of appellant wearing an apron and talking on a cell phone. Dunn acknowledged she had signed and dated the photograph. Other handwritten comments on the photograph included the address of the apartment complex and crime scene and the statement, "[t]his is the guy that showed up in the apartment that night the night of the shooting." The photograph was identical to another photograph entered into

evidence by the Commonwealth and which Detective Davis testified had been extracted from police body camera images of the crime scene.

Detective Davis testified about the crime scene as described above, and further testified that he interviewed appellant on September 24, 2019. Although on the night of the shooting appellant had denied knowing Turner or being familiar with the victims' car, during the September interview appellant now said he knew Turner by his street name, "Dutch." Appellant also stated that on the day of the shooting, Turner and a man he did not know had picked him up from his barbershop in a Cadillac and given him a ride to the apartments where the shooting later occurred. As appellant was exiting the car, Turner gave him a little cocaine. Appellant then went upstairs to an apartment. Although he had denied hearing any gunshots when he spoke with police on the night of the shooting, appellant now told Davis that about 45 minutes after leaving the Cadillac, he heard a shot. Appellant also told Davis that he had helped Turner learn how to make crack cocaine and that before he died, Turner's narcotics business was getting "very big, very fast" and that Turner "got more prestige in that world very fast."

Patrick Zamor, an acquaintance of appellant, testified on behalf of the Commonwealth. Zamor stated that his girlfriend had owed money to appellant and that when they went to pay some of what was owed, appellant told them to "stop playing" and that "this could get real serious." Appellant then warned them, "[y]ou could end up like Dutch." When Zamor asked appellant what he meant, appellant said, "I merk you like Dutch." Zamor explained that "merk" was "a street term for killing." When Zamor tried to "waive[ ] . . . off" appellant's comment, appellant said, "you think I'm joking, you get two to the dome." Zamor understood "dome" to mean "[h]ead." Zamor acknowledged he was incarcerated on a robbery charge at the time of appellant's trial. He denied receiving any type of plea deal or any benefit for his testimony, although he acknowledged he "would like" to get some benefit.

- 5 -

Another witness for the Commonwealth, Reginald Floyd, had been one of appellant's cellmates in jail. Referring to the shootings at the apartment complex, Floyd testified that appellant told him "it was supposed to be a robbery" and that appellant "didn't have to kill them" but "just did it." Appellant also told Floyd that afterward, he went to his brother's home to shower. Appellant said to Floyd that with respect to the murder weapon, "they was just going to have to work harder to find it out at the land fill" and "that it was a 9 millimeter pistol." Floyd later "reached out" to detectives with the information he had learned from appellant. Floyd acknowledged he was incarcerated for possession of cocaine with intent to distribute and that he had been sentenced for that offense the year before the shootings. Floyd denied that he and his attorney were trying to find a way to have Floyd's sentence reduced and denied that he was hoping to get some benefit for his testimony. He specifically denied that he was expecting a reduction in his sentence or any other benefit in his case.

The Commonwealth's forensic evidence at trial included seven 9-millimeter cartridge cases that had been recovered from the scene of the shootings; all seven had been fired from the same gun. Also introduced were cell phone records and expert testimony thereon, which established that appellant's and Turner's phones were traveling in close proximity shortly before the phones arrived at the scene of the shootings.

Appellant moved to strike at the close of the Commonwealth's case-in-chief, and the court denied the motion. Appellant did not present his own evidence. He renewed his motion to strike, and that motion was denied. The jury convicted appellant of two counts of first-degree murder, two counts of use of a firearm in the commission of a felony, and one count of robbery.

Appellant filed a motion for a new trial and an evidentiary hearing. He contended that at trial, he had received ineffective assistance of counsel and the Commonwealth had committed *Brady* violations with respect to Floyd and Zamor.

At a hearing on the motion, one of appellant's trial attorneys, Catherine Paxson, testified that her co-counsel had been hard of hearing and frequently had to ask for statements and sidebar conversations to be repeated.[2] Paxson stated that during appellant's multi-day trial, her co-counsel's hearing deficiencies had repeatedly and negatively impacted his communications with her, appellant, the trial court, the Commonwealth, and the jury.

With respect to alleged *Brady* violations, Paxson testified that based upon her previous work as a prosecutor, she believed Floyd and Zamor had been promised benefits for their testimony. She noted that shortly after appellant's trial, Floyd was favorably resentenced at the initiative of the Commonwealth and Zamor pled guilty to a theft offense on favorable terms. Paxson stated that the Commonwealth's attorney in appellant's case would have been aware of these benefits that awaited Floyd and Zamor and that it had been the Commonwealth's duty to "correct[]" the witnesses' testimony by informing the jury of these benefits. Counsel for appellant also proffered that he had called Floyd's attorney and asked whether Floyd "expected any favorable treatment from the Commonwealth in exchange for his testimony" and that Floyd's attorney had replied, "of course he did." Ultimately, appellant argued that the Commonwealth knew or should have known that Floyd and Zamor had specific arrangements with their prosecutors to benefit from their testimony in appellant's case and that the

---

[2] Paxson is presently employed by the Court as a staff attorney. She took no part in the consideration or resolution of this appeal.

Commonwealth's failure to "correct[ ] the record" when they testified had constituted *Brady* violations.

Appellant called Zamor's attorney, Emily Munn, to testify and sought her statements regarding conversations she had with Zamor or the Commonwealth about "what . . . benefit [Zamor] was looking to receive . . . for his cooperation." The Commonwealth objected to appellant's questioning, and Munn, noting that Zamor had not waived attorney-client privilege, invoked the privilege. The trial court sustained the Commonwealth's objection and refused to direct Munn to testify.

Floyd's attorney, Laurence Bragg, was also called to testify by appellant. He, too, noted that his client had not waived attorney-client privilege and invoked the privilege to refuse to testify about his communications with Floyd. The Commonwealth again objected to appellant's line of questioning. Counsel for appellant argued that Bragg should be compelled to testify because Floyd, Bragg's client, had perjured himself when he testified that he was not working with Bragg to have his sentenced reduced. The court sustained the Commonwealth's objection.

Following the hearing, appellant filed a supplement to his motion that included an unsworn transcript of telephone calls between Floyd and Bragg and between Floyd and a member of Bragg's staff. Appellant argued in his supplement that the contents of the telephone calls included statements by Floyd demonstrating his expectation of receiving a benefit in exchange for his testimony.

In a letter opinion, the trial court denied appellant's motion for a new trial or an evidentiary hearing. Relying on *Hill v. Commonwealth*, 8 Va. App. 60 (1989), the court held that claims of ineffective assistance of counsel were "cognizable only in *habeus corpus* proceedings"; accordingly, the court declined to consider appellant's ineffective assistance of counsel claim. With respect to appellant's *Brady* claims, the court stated that they could "more appropriately be

construed as a post-trial motion for a new trial based on newly acquired evidence." Applying the test for determining whether appellant had "actually shown that any new evidence exists or has been discovered," the court found appellant had failed to make such a showing and that he was simply attempting to re-argue Zamor and Floyd's credibility.

Appellant filed a motion for reconsideration, which the trial court denied. This appeal followed.

## II. ANALYSIS

### A. Ineffective Assistance of Counsel Claim

Appellant argues the trial court erred in denying his motion for a new trial based on his claim of ineffective assistance of counsel because the court "had jurisdiction to rule on the issue." Noting that the court held a hearing to address whether his co-counsel's hearing problems affected appellant's right to counsel, appellant maintains this "suggests that the court had the ability to render a decision" on his claim. We disagree.

"Jurisdictional issues are questions of law, which we review de novo." *McClary v. Jenkins*, 299 Va. 216, 222 (2020); *see also Johnson v. Johnson*, 72 Va. App. 771, 777 (2021).

"[C]laims of ineffective assistance of counsel are not properly raised on direct appeal and must be raised in a separate habeas petition to the [appellate] Court or the circuit court." *Kenner v. Commonwealth*, 71 Va. App. 279, 297 (2019); *see also Sigmon v. Dir. of Dep't of Corrs.*, 285 Va. 526, 533 (2013) ("[C]laims of ineffective assistance of counsel are not reviewable on direct appeal and thus can be raised only in a habeas corpus proceeding."). Here, in denying appellant's motion for a new trial and an evidentiary hearing, the trial court declined to consider appellant's ineffective assistance of counsel claim because such claims are "not cognizable on direct appeal" and must be raised in habeas corpus proceedings. In so ruling, the court correctly

interpreted and applied the law. Accordingly, the court committed no error when it held that appellant's ineffective assistance of counsel claim was not properly before the court.

## B. *Brady* Claims

Appellant argues the trial court erred in denying his motion for a new trial based upon his *Brady* claims. He contends that "Floyd and Zamor, who stated that [appellant] admitted to committing the murders," did not acknowledge to the jury that they had "deals or expectations" with the Commonwealth "to receive reduced sentences in exchange for their testimony." As evidence supporting his contention, appellant notes the chronological proximity of his convictions and Floyd and Zamor receiving favorable treatment from the Commonwealth, Paxson's testimony about her familiarity with the conduct of the Commonwealth's Attorney's Office, and the unsworn transcripts of telephone calls between Floyd and his attorney's office. Ultimately, appellant contends that the Commonwealth did not meet its *Brady* obligations when it failed to disclose the full extent of the offers made to the witnesses and then failed to correct the record following their testimony.

Under the rule established in *Brady*, "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Mercer v. Commonwealth*, 66 Va. App. 139, 146 (2016) (quoting *Brady*, 373 U.S. at 87). "There are three components of a violation of the rule of disclosure first enunciated in *Brady*." *Workman v. Commonwealth*, 272 Va. 633, 644 (2006). First, "[t]he evidence not disclosed to the accused 'must be favorable to the accused, either because it is exculpatory[ ]' or because it may be used for impeachment." *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). Second, the Commonwealth must have withheld the evidence, without regard to whether it did so "willfully or inadvertently." *Id.* Third, the evidence must be "material" under *Brady*, meaning "there is a

reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Commonwealth v. Tuma*, 285 Va. 629, 634-35 (2013) (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)); *see also Workman*, 272 Va. at 644-45 (describing third prong as whether the accused was prejudiced). "The accused has the burden of establishing each of these three components to prevail on a *Brady* claim." *Mercer*, 66 Va. App. at 146 (quoting *Tuma*, 285 Va. at 635). "Although '[i]n reviewing the denial of a *Brady* motion, the [trial] court's factual findings will not be disturbed absent clear error,' this Court reviews the [trial] court's legal conclusions *de novo*." *Warnick v. Commonwealth*, 72 Va. App. 251, 263 (2020) (first alteration in original) (quoting *Church v. Commonwealth*, 71 Va. App. 107, 116 (2019)).

Here, although appellant asserted *Brady* claims in his post-trial motion, the trial court resolved those claims by treating them as a motion for a new trial based on alleged newly acquired evidence. In doing so, the court applied the test for determining whether appellant had demonstrated the existence of new evidence and not the test for determining whether appellant had established *Brady* violations. *See Bagley v. Commonwealth*, 73 Va. App. 1, 22 (2021) (providing a four-part test for evaluating a motion for a new trial based on after-discovered evidence); *Castillo v. Commonwealth*, 70 Va. App. 394, 466 (2019) (providing the three requirements for a defendant to establish a *Brady* violation). Because the court applied the wrong legal test in addressing and resolving appellant's *Brady* claims, it erred as a matter of law, and thus abused its discretion. *See Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021) ("[A] trial court 'by definition abuses its discretion when it makes an error of law.'" (quoting *Robinson v. Commonwealth*, 68 Va. App. 602, 606 (2018))). Accordingly, we reverse the court's *Brady* ruling and remand for the limited purpose of conducting a new *Brady* hearing.

## C. Attorney-Client Privilege

Appellant next argues the trial court erred in allowing Munn and Bragg, the attorneys for Zamor and Floyd, respectively, to assert attorney-client privilege at the hearing on his post-trial motion. Appellant contends that the attorneys should have been compelled to testify and that they would have testified to conversations demonstrating their clients' "concrete and solid expectations that they would receive reduced jail time for their testimony against [appellant]." Appellant also argues that both Floyd and Zamor waived attorney-client privilege.

We do not reach the merits of appellant's arguments because of our holding, above, that the trial court erred in its *Brady* ruling and that remand for a new *Brady* hearing is required. Appellant's arguments concerning the substance of Munn's and Bragg's conversations with their clients, whether their clients waived attorney-client privilege, and whether Munn and Bragg should have been compelled to testify are not severable from appellant's larger *Brady* claims. Accordingly, these arguments, as raised by appellant below and subsequently on appeal in this assignment of error, are properly a matter for consideration in the new *Brady* hearing on remand.

## D. Use of Dunn's Preliminary Hearing Testimony

Appellant argues the trial court erred "in allowing the [p]robable [c]ause transcript testimony of witness Shakinah Dunn being offered [sic] into evidence in lieu of her live testimony." Specifically, he contends Dunn was present and available to testify at appellant's trial, and yet "the [c]ourt permitted the Commonwealth to have Dunn directly read" portions of her preliminary hearing transcript into evidence. Appellant asserts this was error which was prejudicial to him because it "improperly bolstered" Dunn's testimony and denied him "the opportunity for *effective* cross-examination."

We need not reach the merits of appellant's argument, because appellant failed to preserve this issue for appellate review. This is so because on those occasions when the

Commonwealth requested Dunn to read from the transcript of her preliminary hearing testimony, and she complied, appellant raised no objection. "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of th[e] contemporaneous objection requirement [in Rule 5A:18] is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015). "Specificity and timeliness undergird the contemporaneous-objection rule, animate its highly practical purpose, and allow the rule to resonate with simplicity." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019). Consequently, an objection "must be both *specific* and *timely* — so that the trial judge would know the particular point being made in time to do something about it." *Id.* (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)). Where a party fails to timely and specifically object, that party waives its argument on appeal. *Arrington v. Commonwealth*, 53 Va. App. 635, 641 (2009). This principle applies even to the exclusion of constitutional arguments. *See, e.g.*, *Foster v. Commonwealth*, 38 Va. App. 549, 555 (2002). Because appellant did not object when Dunn read excerpts from her preliminary hearing testimony at his trial, appellant has waived this issue for purposes of appellate review.

## E. Sufficiency of the Evidence

Appellant contends the trial court erred in denying his motion to strike. Specifically, he argues the evidence failed to prove "that [he] did anything but ride with the victims to the apartment complex where they were later found shot to death."

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original)

- 13 -

(quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). Instead, "the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

The fact-finder "'is entitled to consider all of the evidence,' direct and circumstantial, 'in reaching its determination.'" *Mollenhauer v. Commonwealth*, 73 Va. App. 318, 333 (2021) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017)). "Circumstantial evidence, if sufficiently convincing, is as competent and entitled to the same weight as direct testimony." *Maust v. Commonwealth*, 77 Va. App. 687, 699 (2023) (en banc) (quoting *McCain v. Commonwealth*, 261 Va. 483, 493 (2001)). Additionally, determining "the 'credibility of the witnesses and the weight of the evidence' are tasks left 'solely [to] the trier of fact' unless those determinations are 'plainly wrong or without evidence to support [them].'" *Nelson v. Commonwealth*, 73 Va. App. 617, 622 (2021) (alterations in original) (quoting *Wactor v. Commonwealth*, 38 Va. App. 375, 380 (2002)). This is so because the fact-finder "has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). The fact-finder is "free to believe or disbelieve, in part or in whole, the testimony of any witness." *Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004) (en banc).

Similarly, in its role of judging credibility, "the fact finder is entitled to disbelieve the self-serving [statements] of the accused and to conclude that the accused is lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)). Ultimately, appellate review of the sufficiency of the evidence "requires a 'totality-of-the-evidence analysis.'" *Mollenhauer*, 73 Va. App. at 334 (quoting *Moseley*, 293 Va. at 464).

We are unconvinced by appellant's argument. Appellant asserts that the evidence only showed that he drove with the victims to the apartment complex where they were later found shot to death. But the evidence, viewed in its totality, demonstrated far more than that. At the scene of the shootings, appellant initially denied to Detective Davis that he was familiar with the victims' car, knew victim Turner, or had heard any gunshots; when subsequently interviewed again by Davis, appellant gave a contradictory account. He acknowledged knowing Turner, or "Dutch," and riding to the apartment complex with Turner and another man, and also stated he had taught Turner how to make crack cocaine. He also acknowledged hearing a gunshot on the night of the shootings. The jurors were entitled to view appellant's initial, subsequently self-contradicted denials as self-serving statements intended to conceal his guilt. *See Flanagan*, 58 Va. App. at 702.

Dunn's evidence demonstrated that on the night of the shootings, appellant came into the apartment where Dunn was staying and stated, "I fucked up." He also said that he had "just c[o]me up" after "hit[ting] a lick," which Dunn described as a term meaning a robbery. Appellant then produced a large quantity of money and a watch. As appellant later admitted to Detective Davis, appellant knew that Turner was in the narcotics business and had become "very big, very fast." The jury was entitled to credit Dunn's and Davis's testimony and to infer from it

that appellant had robbed Turner of money he suspected Turner possessed and that the robbery had resulted in unintended fatalities.

Such reasonable inferences were corroborated by the testimony of Zamor and Floyd. Zamor testified that appellant warned him he could "end up like Dutch," and then clarified that he meant he might "merk"—i.e., kill—Zamor "like Dutch." Appellant also told Zamor he might get "two to the dome," or head, when "Dutch" had been shot twice in the head. Similarly, Floyd testified appellant told him that "it was supposed to be a robbery," but that he had ended up killing the two victims. He also stated that the murder weapon had been a 9-millimeter pistol, and police recovered 9-millimeter cartridge cases from the scene of the shootings. Floyd's testimony that appellant stated he had gone to an apartment and taken a shower after the killings also corroborated part of Dunn's testimony about appellant's actions the night of the shootings.

Considering the totality of the evidence, a rational trier of fact could have found the evidence sufficient to convict appellant of all the murder, robbery, and firearms charges. Accordingly, we find no error by the trial court in denying appellant's motion to strike.

### III. CONCLUSION

The trial court did not err in denying appellant's motion for a new trial based on claims of ineffective assistance of counsel or in denying appellant's motion to strike. Appellant's argument that the trial court erred in allowing certain uses of a preliminary hearing transcript at trial was not preserved for appellate review. However, the trial court erred, and abused its discretion, by applying the wrong legal principles in addressing and resolving appellant's *Brady* claims. Accordingly, we affirm in part, reverse in part, and remand for the limited purpose of the trial court conducting a new *Brady* hearing.

*Affirmed in part, reversed in part, and remanded.*