# COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Causey, Raphael and Senior Judge Clements
Argued at Loudoun, Virginia


DANY EDGARDO HERNANDEZ

                                                     MEMORANDUM OPINION[*] BY
v.       Record No. 1221-22-4            JUDGE JEAN HARRISON CLEMENTS
                                                         DECEMBER 12, 2023

COMMONWEALTH OF VIRGINIA


### FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Tracy C. Hudson, Judge

Shalev Ben-Avraham, Senior Assistant Public Defender (Office of
the Public Defender, on briefs), for appellant.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Dany Edgardo Hernandez appeals his convictions, in a jury trial, for conspiracy to commit

murder, first-degree murder, stabbing in the commission of a felony, and three counts of gang

participation under Code §§ 18.2-22, -32, -53, and -46.2.  He argues that the trial court erred by not

striking a juror for cause, that the Commonwealth violated *Brady*[1] and *Napue*,[2] and that some of his

sentences must be set aside under double jeopardy principles.  Finding no error, we affirm the

judgment of the trial court.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

[2] *Napue v. Illinois*, 360 U.S. 264 (1959).

BACKGROUND[3]

"On appeal, we view the record in the light most favorable to the Commonwealth because it was the prevailing party below." *Delp v. Commonwealth*, 72 Va. App. 227, 230 (2020). "Viewing the record through this evidentiary prism requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Commonwealth v. Cady*, 300 Va. 325, 329 (2021) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018)).

Hernandez was indicted in Prince William County for conspiracy to commit murder, first-degree murder, use of a firearm in commission of a murder, and stabbing in the commission of a felony, all related to the death of Wilfredo Guardado-Huezo, in violation of Code §§ 18.2-32, -22, -53, and -53.1. Hernandez was also indicted on three counts of gang participation under Code § 18.2-46.2, with the conspiracy to commit murder, first-degree murder, and the shooting or stabbing offenses serving as the three predicate criminal acts.

A potential juror, G.B., disclosed during the trial's voir dire that he was the victim of a violent assault by a group in which he was struck with a wine bottle while on a bus, causing an injury to his head requiring stitches. When asked if he could be fair and objective in reviewing the evidence, G.B. stated, "It was a minority that attacked me. I'm going to try but I'm just saying I had the top of my head taken off, I had a reverse mohawk, I had it sewn back on." G.B. stated he would do his best to be impartial and denied believing Hernandez more likely to be

---

[3] The record in this appeal is partially sealed. "To the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

guilty as a minority. Hernandez made no motion to strike G.B. for cause, instead eliminating G.B. from the pool with a peremptory strike.

Wilfredo Guardado-Huezo, a member of the 18th Street gang as defined under Code § 18.2-46.1, was killed in the early morning hours of April 17, 2017, in an alley next to the restaurant Tom's Diner in Manassas. On the other side of Tom's Diner was another restaurant, Don Julio's. Don Julio's had indoor surveillance cameras and outdoor surveillance of the back parking lot between the two restaurants. When law enforcement arrived on scene immediately after the killing and reviewed the footage, they developed Denis Sanchez as a suspect and detained him in Don Julio's.

Sanchez was a member of MS-13, a criminal gang as defined under Code § 18.2-46.1. Sanchez knew Hernandez as a higher-ranking MS-13 member. Don Julio's internal surveillance showed Guardado-Huezo make hand signs associated with the 18th Street gang at Sanchez. The 18th Street gang was the primary rival of MS-13.

After seeing Guardado-Huezo display the hand signs, Sanchez left the restaurant and drove to Hernandez's trailer. There, Sanchez told Hernandez, "Cruz," and "Christian" that an 18th Street member was at Don Julio's. Hernandez told Sanchez, Cruz, and Christian that they could move up in rank in the gang by killing Guardado-Huezo. Hernandez armed himself with a knife and machete. Cruz had a .45 caliber firearm, and Sanchez had a .38 caliber firearm. All three left the lot and drove to a 7-Eleven store, where surveillance showed Sanchez buying Newport cigarettes.

Don Julio's outdoor surveillance showed the three drive into the parking lot of the restaurant. Sanchez got out of the driver's seat and went back inside the restaurant. When Sanchez re-entered Don Julio's, Guardado-Huezo was still there. In the meantime, Hernandez and Cruz waited outside, and leaned against the car; Hernandez smoked one of the cigarettes bought at the 7-Eleven. Hernandez wore a hat given to him by Sanchez.

Surveillance footage showed Guardado-Huezo leaving the restaurant, walking by Hernandez and Cruz in the parking lot, and entering the alley outside the view of the camera. Hernandez dropped his cigarette next to the car; while pulling objects out of their clothing, Hernandez and Cruz both followed Guardado-Huezo.[4] Almost immediately after Hernandez and Cruz entered the alley there were flashes on the surveillance footage consistent with gunfire, and two people then fled the alley back through the parking lot.

Although Guardado-Huezo was alive when law enforcement arrived on scene, he was unable to communicate and ultimately died from two stabbing wounds and five gunshot wounds in his torso. Guardado-Huezo had three bullets in his body; two more bullets and shell casings were found in the alley and a third bullet in a nearby restaurant. The bullets and casings were all fired with a .45 caliber semi-automatic firearm.

Behind the restaurants, in the direction Hernandez and Cruz fled, were trailer park units where Hernandez's girlfriend at the time lived. The day after the murder, Hernandez told her that he needed to leave and could not stay at his normal trailer because "other people" were there. Hernandez said they were at Don Julio's the night of the murder because "a friend had told him that there was another person there" and "that something went wrong," but Hernandez would not explain further. He indicated that the other person was a rival of MS-13.[5] When police searched a trailer lot Hernandez's girlfriend confirmed he stayed at, they found a knife and a .45 caliber magazine with corresponding bullets and case cartridges, along with MS-13 paraphernalia.

---

[4] Law enforcement collected that cigarette butt; analysis showed that Hernandez could not be eliminated as a contributor to the DNA on that cigarette.

[5] After Hernandez had been arrested, he called the former girlfriend and asked her to lie and provide him an alibi for that night. She testified that at the time of the murder, Hernandez sometimes stayed at a nearby trailer.

Eric Contreras testified for the Commonwealth as a former member of MS-13 and an expert on its gang culture. Two days after the murder, Hernandez went to Contreras's apartment and said that he had planned the killing, waited for Guardado-Huezo to leave the restaurant, and stabbed him with Cruz. Hernandez told Cruz to shoot him, and after Cruz fired, Hernandez took the gun and also shot Guardado-Huezo. Hernandez and Cruz then ran to the trailer. Contreras admitted to having pending unrelated charges but denied that he was promised anything in exchange for his testimony. When asked why he was testifying, Contreras stated that he wanted out of the gang and that Hernandez wanted to blame him for the murder. On cross-examination, when asked what benefit he was getting for his testimony, Contreras stated:

> None for right now. I'm not getting anything. I'm not receiving any kind of benefit. I don't know about anything. I had gone, seen a lot of cases. I know about a lot of cases, but I don't want to be in the gang anymore. . . . And when I was on the gang side of things, there's a saying that the police are the enemy. So now I kind of view that as, well, now I'm kind of with them, and you could maybe take it like that, that maybe now I'm with them, because I'm collaborating with them.

A law enforcement gang expert later testified that he commonly works with gang members testifying against their fellow gang, and he agreed that "[m]ost likely, when someone does something, they're going to want something in return for it."

After the jury convicted Hernandez of all counts except using a firearm in the commission of a felony, Hernandez's counsel discovered an audio recording of a meeting between Contreras and the prosecutors who represented the Commonwealth at Hernandez's trial. In that recording, the prosecutors continually told Contreras that they could not make specific promises to him about what impact his cooperation would have in his own case, and Contreras admitted that he was cooperating to avoid jail time. The recording also indicated that the prosecutors met with Contreras on more than one occasion.

Hernandez then filed several post-trial motions. He argued that multiple sentences for gang participation under Code § 18.2-46.2 would violate double jeopardy, that the trial court erred in not striking G.B. for cause sua sponte, and that the Commonwealth violated *Brady* and *Napue* for failing to disclose the recording before trial and correct Contreras's testimony during trial. The trial court considered the motions on their merits and denied them. The trial court then entered a sentencing order imposing 85 years of incarceration with 50 years suspended. This appeal follows.

ANALYSIS

I. *Brady* and *Napue* Violations

Hernandez first argues that the Commonwealth's failure to turn over Contreras's audio recording before trial was a violation of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and that the Commonwealth's failure to correct Contreras's testimony about why he was testifying and the number of times he met with the Commonwealth violated *Napue v. Illinois*, 360 U.S. 264 (1959), both of which require a new trial.

When reviewing alleged constitutional violations, "[w]e review the trial court's findings of historical fact only for 'clear error,' but we review *de novo* the trial court's application of defined legal standards to the particular facts of a case." *Castillo v. Commonwealth*, 70 Va. App. 394, 466 (2019) (quoting *Doss v. Commonwealth*, 59 Va. App. 435, 455 (2012)).

"Under *Brady*, 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Mercer v. Commonwealth*, 66 Va. App. 139, 146 (2016) (quoting *Brady*, 373 U.S. at 87). "There are three components of a violation of the rule of disclosure first enunciated in *Brady* . . . ." *Workman v. Commonwealth*, 272 Va. 633, 644 (2006). First, "[t]he evidence not disclosed to the accused 'must be favorable to the accused, either because it is exculpatory[]' or because it may be used for impeachment."

*Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  Second, the Commonwealth must have withheld the evidence, without regard to whether it did so "willfully or inadvertently." *Id.*  Third, the evidence must be "material" under *Brady*, meaning "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Commonwealth v. Tuma*, 285 Va. 629, 634-35 (2013) (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)); *see also Workman*, 272 Va. at 644-45 (describing the third prong as whether the accused was prejudiced).  "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'" *Cain*, 565 U.S. at 75 (alteration in original) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).  However, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Johnson v. Commonwealth*, 53 Va. App. 79, 106 (2008) (quoting *United States v. Agurs*, 427 U.S. 97, 109-10 (1976)).  "The accused has the burden of establishing each of these three components to prevail on a *Brady* claim." *Mercer*, 66 Va. App. at 146 (quoting *Tuma*, 285 Va. at 635).

Just as under *Brady*, if the Commonwealth knowingly fails to correct false testimony, then the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Teleguz v. Commonwealth*, 273 Va. 458, 492 (2007) (quoting *Agurs*, 427 U.S. at 103).  This is true even if "the false testimony goes only to the credibility of the witness." *Napue*, 360 U.S. at 269.  This Court "must determine first that the testimony [at issue] was false, second that the prosecution knew of the falsity, and finally that the falsity affected the jury's judgment." *Teleguz*, 273 Va. at 492.

Throughout the recorded interview, the prosecutors gave Contreras examples of the types of influence the Commonwealth wielded and how that influence possibly could impact Contreras's own case. However, they made no specific quid pro quo deal with Contreras. The record clearly supports the trial court's factual finding that the Commonwealth made Contreras no promises of any kind in return for his testimony. Thus, the Commonwealth was not obligated to correct Contreras's testimony that no promises were made in exchange for his testimony, especially given Contreras's admission at trial that he was given no promises "for right now."

Nonetheless, the trial court found that the prosecutor under *Napue* "probably should have corrected" Contreras's statement at trial that he was testifying only because he wanted to get out of the gang, and Contreras's recorded admission of hope for limiting his incarceration was impeachment evidence that the Commonwealth should have disclosed under *Brady*. However, the trial court ultimately found that due to the overwhelming evidence establishing Hernandez's guilt, these failures did not likely impact the jury's judgment. Assuming without deciding that this evidence should have been disclosed pre-trial and corrected at trial, we find that the record supports the trial court's finding that there was no impact upon the verdict.

In his testimony, Sanchez described the entire course of events on the night of the murder, from his first interaction with Guardado-Huezo until after Guardado-Huezo died, and was fully corroborated by surveillance footage at Don Julio's and 7-Eleven. Sanchez's testimony established that Hernandez plotted, directed, and enacted Guardado-Huezo's murder while armed with a knife and machete. DNA evidence further corroborated Hernandez as one of the assailants captured on that surveillance footage. Hernandez admitted his involvement to his girlfriend at the time and asked her to lie to create a false alibi. The Commonwealth's gang expert's testimony that gang members cooperate to help themselves impeached Contreras's testimony. The only charge that would have rested entirely on Contreras's testimony was the felonious use of a firearm, as Sanchez

testified that Hernandez was not armed with a gun.  The jury acquitted Hernandez of that offense.

Hernandez's crimes of conviction were supported by overwhelming evidence independent of

Contreras's testimony, and we will not disturb the trial court's finding that a new trial was

unwarranted under *Napue* or *Brady*.[6]

## II.  Juror Bias

Hernandez argues that the trial court erred by failing to strike, sua sponte, G.B. for cause as

a juror for bias.  He asserts that he is entitled to a new trial as a result.  We disagree.

Hernandez did not make a motion to strike G.B. for cause, and instead used a peremptory

strike to remove G.B from the jury panel.  His post-trial motion to set aside the verdict asserted for

the first time that the trial court erred in not striking G.B. for cause sua sponte.  Generally,

objections related to the selection of the jury must be raised either during voir dire or before the

jury is empaneled.  *See Green v. Commonwealth*, 266 Va. 81, 100 (2003) ("Because [defendant]

failed to raise any objection either during the voir dire of prospective juror Young or before she

was empanelled and sworn as a juror to hear the case, he has waived the argument that he now

presents on appeal."); *see also Beavers v. Commonwealth*, 245 Va. 268, 278 (1993); *Spencer v.

Commonwealth*, 238 Va. 295, 306-07 (1989).  Although Rule 3A:14(b) permits a trial court to

strike a juror on its own motion, a defendant is still required to timely object to preserve the

argument.  *Green*, 266 Va. at 101; Rule 5A:18.

Nonetheless, Code § 8.01-352 permits a litigant to make a post-trial juror motion "with

leave of court."  *See Hill v. Berry*, 247 Va. 271, 273-74 (1994) (Code § 8.01-352 preserved a

post-trial juror challenge based on *Batson v. Kentucky*, 476 U.S. 79 (1986)); *Robert M. Seh Co.,*

---

[6] Hernandez asks this Court to fashion a new rule that all willful violations of *Brady* should result in a new trial, irrespective of whether the defendant establishes that the violation created a "reasonable probability" of a different outcome.  We decline to do so as this Court is bound by precedent requiring such a finding.  *See Tuma*, 285 Va. at 634-35 (following *Smith*, 565 U.S. at 75).

*Inc. v. O'Donnell*, 277 Va. 599, 603 n.3 (2009) (Code § 8.01-352 preserved a post-trial motion to strike a juror for bias). Because the trial court addressed Hernandez's post-trial motion on its merits, it "implicitly granted" Hernandez leave to make this motion. *See Mason v. Commonwealth*, 255 Va. 505, 509 (1998) ("Here, the trial court implicitly granted [defendant] leave to challenge the juror because the court decided his motion."). Thus, we review on appeal whether the trial court abused its discretion in denying Hernandez's post-trial motion. *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013). However, for Hernandez to succeed on appeal by way of his post-trial motion, he must show that the juror's "disability be such as to probably cause injustice" in his case. Code § 8.01-352(B); *see also Mason*, 255 Va. at 510.

Hernandez removed G.B. from the jury with a peremptory strike. Normally, "[i]t is prejudicial error for the trial court to force a defendant to use the peremptory strikes . . . to exclude a venireman who is not free from exception." *Breeden v. Commonwealth*, 217 Va. 297, 300 (1976). However, because Hernandez did not raise an objection until after trial, he must now establish that his use of a peremptory strike against G.B. "probably cause[d] injustice." Code § 8.01-352(B). Hernandez has failed to establish what, if anything, would have differed in the empaneled jury as a result of his using a peremptory strike against G.B. Thus, he did not prove that his use of a peremptory strike "probably cause[d] injustice." Code § 8.01-352(B). We therefore affirm the trial court's denial of his motion.

Hernandez argues that the trial court erred in refusing to find that his three sentences for gang participation under Code § 18.2-46.2 violated double jeopardy.[7] We disagree and affirm the trial court.[8]

We review questions pertaining to double jeopardy or statutory interpretation de novo. *Davis v. Commonwealth*, 57 Va. App. 446, 455 (2011). The Double Jeopardy Clause of the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "Virginia's constitutional guarantee against double jeopardy affords a defendant the same guarantees as the federal Double Jeopardy Clause." *Stephens v. Commonwealth*, 263 Va. 58, 62 (2002). "This constitutional provision guarantees protection against (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense." *Johnson v. Commonwealth*, 292 Va. 738, 741 (2016) (quoting *Payne v. Commonwealth*, 257 Va. 216, 227 (1999)).

When an accused is tried for multiple offenses in the same trial, only the third prohibition is at issue. *Turner v. Commonwealth*, 221 Va. 513, 529-30 (1980). "[T]he Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Stephens*, 263 Va. at 63 (quoting *Missouri v. Hunter*, 459 U.S. 359,

---

[7] Hernandez also argues, briefly and with no independent authority, that these same principles preclude his sentences for both conspiracy to commit murder and first-degree murder; this argument contradicts well-established precedent clearly stating otherwise. *See Schwartz v. Commonwealth*, 45 Va. App. 407, 438-39 (2005); *Boyd v. Commonwealth*, 236 Va. 346, 351 (1988).

[8] The Commonwealth asserts that Hernandez's argument is waived for failure to comply with Rule 3A:9, as he raised the double jeopardy claim in a motion post-trial. However, Rule 3A:9(d) permits the trial court to entertain the motion "[f]or good cause," and the trial court's implicit finding of such by ruling on the merits means we will entertain these arguments on appeal.

366 (1983)).  "When considering multiple punishments for a single transaction, the controlling factor is legislative intent."  *Johnson*, 292 Va. at 741 (quoting *Kelsoe v. Commonwealth*, 226 Va. 197, 199 (1983)).  "[T]he question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed."  *Stephens*, 263 Va. at 63 (quoting *Whalen v. United States*, 445 U.S. 684, 688 (1980)).  It is within the legislature's discretion to determine the "'unit of prosecution' and set the penalty for separate violations."  *Johnson*, 292 Va. at 741 (quoting *Jordan v. Commonwealth*, 2 Va. App. 590, 594 (1986)).

Code § 18.2-46.2 criminalizes knowing and willful participation "in any predicate criminal act committed for the benefit of, at the direction of, or in association with any criminal street gang[.]"  Code § 18.2-46.1 defines a "predicate criminal act" specifically as stabbing in the commission of a felony under Code § 18.2-53, among other enumerated statutory violations, as well as any "act of violence."  Under Code § 19.2-297.1, both first-degree murder and conspiracy to commit first-degree murder are "acts of violence."  Thus, each of Hernandez's three underlying convictions are criminal acts that may serve as the "predicate" for a conviction under Code § 18.2-46.2.

"Virginia courts 'presume that the legislature chose, with care, the words it used when it enacted the relevant statute.'"  *Prease v. Clarke*, __ Va. __, __ (July 6, 2023) (quoting *Tvardek v. Powhatan Vill. Homeowners Ass'n Inc.*, 291 Va. 269, 277 (2016)).  "The one canon of construction that precedes all others is that '[w]e presume that the legislature says what it means and means what it says.'"  *Id.* at __ (quoting *Tvardek*, 291 Va. at 277).  We therefore presume that the legislature's choice to use "any predicate criminal act" means *any* single enumerated offense may serve as the predicate criminal act and does not encompass several predicate criminal acts.  Code § 18.2-46.2.  If the legislature had intended for only one punishment of gang

activity for multiple predicate criminal acts, it would have used "one or more predicate criminal acts" in lieu of "any predicate criminal act." *See Johnson*, 292 Va. at 741-42 (holding that the unit of prosecution for failing to appear in court under Code § 19.2-128 was the number of charged felonies because the statute used "a" felony rather than language such as "one or more felonies").  Accordingly, the trial court did not err in rejecting Hernandez's claim that sentencing him upon more than one conviction for criminal gang participation violated double jeopardy principles.

## CONCLUSION

For the reasons stated above, we affirm the order of the trial court.

*Affirmed*.